STATE of Utah, Plaintiff and Appellee,

v.

Vongpachan PIANSIAKSONE,
Defendant and Appellant.

No. 960170.

Supreme Court of Utah.

Feb. 13, 1998.

Jan Graham, Attorney General, Joanne C. Slotnik, Assistant Attorney General, Howard Lemke, Salt Lake City, for plaintiff and appellee.

L. Clark Donaldson, Richard G. Uday, Salt Lake City, for defendant and appellant.

STEWART, Justice:

A jury found Vongpachan Piansiaksone guilty of murder, a first degree felony, pursuant to Utah Code Ann. § 76–5–203, for shooting and killing Sichan Or. On appeal, Piansiaksone asserts that the trial court erred by (1) admitting evidence of his confession to San Diego police detectives, (2) refusing to ask voir dire questions that would have enabled him to make a more intelligent use of his peremptory challenges, (3) directing the jury to follow a particular order in considering the charged offense and the lesser included offense of manslaughter so that the jury was prevented from considering the lesser included offense, and (4) instructing the jury incorrectly on the law of manslaughter.

In late July 1994, Piansiaksone returned to his parents' home in West Valley City from San Diego, where he had been staying for several months. He was sixteen years old at that time. Early in the afternoon of July 31, Piansiaksone went to a barbecue that was also attended by Anouphong Khamsiharath, known as "Nuk." Piansiaksone and Nuk, who had known each other for two years, are related through a cousin by marriage, although Nuk characterized his relationship with Piansiaksone as being like a cousin or an older brother. Sometime during the barbecue, Nuk told Piansiaksone that he was angry with Sichan Or ("Clay"), who was married to Nuk's sister Yong, because Clay "had been beating up on [Yong] and just doing things that [Nuk] didn't like." Nuk testified at trial that he was also angry with Clay because Clay had made sexual advances or "had been trying to rape" Nuk's wife, Da, while both couples were living with Nuk's parents earlier in 1994. (In May 1994, when Nuk learned about this from his wife, he moved his family out of his parents' home to get away from Clay.) However, Nuk did not tell Piansiaksone until after the shooting that his anger with Clay stemmed in part from these advances.

On the day of the barbecue, Nuk told Piansiaksone that he "wanted to kill Clay" and asked or instructed Piansiaksone to shoot Clay for him. Nuk testified that he wanted Piansiaksone to do the shooting in part because Piansiaksone was a juvenile, while Nuk was an adult with a wife and child, evidently assuming that Piansiaksone's youth would result in a lighter penalty. They took Nuk's "Tech–9" semiautomatic pistol and went out in Nuk's truck looking for Clay, with Nuk driving and Piansiaksone riding in the passenger seat. The gun had been stowed beneath the passenger seat in a bag. They located Clay on a street near the Lakepark Apartments, which appears to be where Clay was living. After Nuk stopped the

truck, Clay walked up to the driver's side window to speak with Nuk. Piansiaksone then took the gun out from under the seat and shot Clay three times at close range in the upper chest and left arm. Clay died shortly thereafter.

Piansiaksone and Nuk fled, going first to San Diego and then to Las Vegas. Nuk testified that in San Diego, Piansiaksone agreed that if they were arrested he would take all the blame for shooting Clay and say that Nuk did not know anything about it. Nuk was arrested in Las Vegas a few days after the shooting. Piansiaksone avoided arrest at that time and returned to San Diego. West Valley City law enforcement officers asked the San Diego Police Department for assistance in apprehending Piansiaksone, and early in the morning of August 15, San Diego police detective Michael Gallivan was informed where Piansiaksone was staying in San Diego. Gallivan and other officers went to that residence and found Piansiaksone sleeping on the dining room floor. They awoke him and arrested him at 4:15 a.m. The officers informed him that he was under arrest for homicide, transported him to the police station, and gave him the *Miranda* warnings.[1] Gallivan and another officer questioned Piansiaksone, and the interview was videotaped. Piansiaksone confessed almost immediately to shooting Clay. Although the detectives pressed Piansiaksone about Nuk's involvement, he maintained that Nuk did not actively participate in the shooting.

Piansiaksone was certified to stand trial as an adult. Prior to trial, he moved to suppress evidence of his confession to the San Diego detectives. The trial court denied the motion. Following jury selection, Piansiaksone objected to the court's refusal to give certain of his proposed voir dire questions. He also raised objections to the jury instructions on several grounds. The jury returned a guilty verdict on the murder charge, and this appeal followed.

## I. MOTION TO SUPPRESS

Piansiaksone asserts that the trial court erred in denying his pretrial motion to suppress evidence of his confession to San Diego police detectives. He contends that the detectives used "physical and psychological manipulation" to coerce his confession and that evidence of the confession should therefore have been suppressed. The State responds that denial of the motion was correct because Piansiaksone failed to produce any evidence of police coercion and to show how any such coercion caused him to confess.

At the time Piansiaksone was arrested, he had been sleeping for about twenty-four hours. The arresting officers awoke him, gave him a partial *Miranda* warning, allowed him to put on additional clothing, and transported him to the station. He did not fall asleep while riding to the station in the patrol car. At the station, he was taken to an interview room, where the detectives questioned him. An edited videotape of this interrogation was entered into evidence at the trial. The videotape shows that Detective Gallivan first questioned Piansiaksone about his vital statistics, i.e., his name, age, background, family, home address. Piansiaksone and the detectives then left the room so that he could be photographed. After their return, Gallivan continued the interrogation at 5:37 a.m. by explaining why Piansiaksone, also known as Mac, had been arrested:

> How are you doing, Mac? Are you all right? Okay. Let me—let me explain to you, okay, you know, why you're here. Okay, the reason why we arrested you— and, and, as you said, you already know why you're here, because I told you when we picked you up—is that we have a warrant for your arrest, okay, for a homicide—murder, all right? And this murder occurred in West Valley City, Utah.

Gallivan introduced himself and the other detective, noted that Piansiaksone was read his rights when arrested, stated that he was going to explain those rights again "[b]ecause we would like to hear your side of the story," and proceeded to give Piansiaksone the *Miranda* warnings. After Piansiaksone stated that he understood those rights and that he was still willing to speak to the detectives, the following exchange took place:

1. *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

**Gallivan:** And it's August 15th, '94 and it's 5:38 in the morning. Okay, here's the thing, okay? We don't know much about you—I mean, we're going to be honest with you. We know very little about you. We do know that there was a shooting that resulted in the death of a person in West Valley City. Okay? And there was an investigation. During that investigation you were identified as one of the two suspects, okay? Why don't you tell us in your own words what happened? I mean, what we want is we want to get your side of the story. I mean, there's always two sides of the story. Okay? Evidently something set you and your friend off that you would shoot somebody—and why don't you tell us what that was? What happened? You see, here's the thing, Mac, this is your chance to tell us what happened, okay? About what happened. All right, we don't know and nobody else is going to know until you tell us, okay? So why don't you go ahead and tell us what happened?

**Piansiaksone:** Let's see. I don't know. It's just—you know—that day I was doing four or five things, you know? Then I did that. He's from—you know, that guy that I shot, he's from here.

**Gallivan:** He's from here?

**Piansiaksone:** Yeah, he's from San Diego, and he's from some gang that, you know, I don't get along with, and that's OBS.[2]

**Gallivan:** You don't get along with OBS?

**Piansiaksone:** No.

**Gallivan:** Okay.

**Piansiaksone:** And, you know, he was just down there and then, you know, I saw him. I saw my friend and I asked him to use his gun. And then, you know, he was like—he was telling me no and all this stuff, you know. But then, you know, he brought it out. He didn't think—he didn't know I was going to do it. And I—you know, we brought it out, and then it was—it was just in the car with us, and we just rode by, and then I saw that guy, you know, like before, so I brought it out and then, you know, I shot him.

**Gallivan:** Who was the guy?

**Piansiaksone:** Clay.

The tape shows that this confession took place three to four minutes after the beginning of the interrogation. During the course of the interrogation, the detectives repeatedly pressed Piansiaksone to discuss Nuk's involvement in the crime; however, it was not until near the end of the interview that he conceded that he was trying to cover for Nuk and that Nuk knew he was going to shoot the victim.

Piansiaksone argues that the trial court should have suppressed his confession because of a Fifth Amendment violation, not because the police failed to give any warnings required by *Miranda.* The Fifth Amendment "protects individuals from being *compelled* to give evidence against themselves." *State v. Troyer,* 910 P.2d 1182, 1188 (Utah 1995). Although the United States Supreme Court adopted the prophylactic *Miranda* warnings to preserve and reinforce the Fifth Amendment rights of individuals in certain custodial circumstances, those warnings are not themselves constitutionally secured, and a violation of the Fifth Amendment may be found irrespective of whether *Miranda* was breached. *See Oregon v. Elstad,* 470 U.S. 298, 305, 105 S.Ct. 1285, 1291, 84 L.Ed.2d 222 (1985); *New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984). To violate the Fifth Amendment, an accused's admission must, by definition, be coerced. *Troyer,* 910 P.2d at 1188. "Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable." *Elstad,* 470 U.S. at 305, 105 S.Ct. at 1291; *see also United States v. Washington,* 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977). Moreover, "there must be a causal relationship between the coercion and the subsequent confession" to render the confession involuntary. *State v. Mabe,* 864 P.2d 890, 893 (Utah 1993); *see also State v. Hegelman,* 717 P.2d 1348, 1350 (Utah 1986) ("Evidence sufficient to support a finding that a confession is involuntary must reveal some physical or psychological force or manipulation that is designed to induce the ac-

---

**2.** At trial, Detective Gallivan testified that "OBS" stands for "Oriental Boys," a street gang.

cused to talk when he otherwise would not have done so.").

■ To assess whether a confession is the result of coercion, we consider the totality of the circumstances, including whether the police administered the *Miranda* warnings, the place of interrogation, the duration of questioning, whether the questioning was continuous, and the " 'defendant's maturity, education, physical condition, and mental health.' " *Troyer*, 910 P.2d at 1188 (quoting *Withrow v. Williams*, 507 U.S. 680, 693, 113 S.Ct. 1745, 1754, 123 L.Ed.2d 407 (1993)); *see also Mabe*, 864 P.2d at 892; *State v. Moore*, 697 P.2d 233, 236 (Utah 1985); *State v. Strain*, 779 P.2d 221, 225 (Utah 1989).

■ Piansiaksone asserts that five factors rendered the interrogation coercive: his relative youth, his Laotian background, his fatigued condition, possible aftereffects of drug use, and the length of the interview. We conclude, however, that in light of the totality of the circumstances, the confession did not result from coercion. Piansiaksone was given the *Miranda* warnings and thereafter consented to talk to the detectives. He almost immediately confessed to the killing in response to an open-ended invitation to "tell his side of the story." The tape discloses that Gallivan did not use a threatening tone of voice, threatening gestures, or threatening body language. Piansiaksone's resistance through much of the interview to suggestions that Nuk was involved in the shooting support the conclusion that his will "was not overborne" by the officers and that the initial confession was voluntary. *See Strain*, 779 P.2d at 225 (discussing standards for voluntariness). The length of the interview is largely irrelevant in this case. Piansiaksone substantially inculpated himself within the first few minutes of the interrogation.

The fact that Piansiaksone has a Laotian background is also irrelevant without some indication of how that would have contributed to a coercive atmosphere. He has not argued that he was unable to understand or communicate with the detectives, nor has he identified any trait associated with his background that would make him particularly vulnerable to coercion or that would distinguish him from any other citizen.

While Piansiaksone alludes to his suffering the lingering effects of drug use, he does not indicate what those effects were or how they could have affected the nature of the interrogation. Detective Gallivan testified at the suppression hearing that Piansiaksone did not appear to be intoxicated and had no difficulty in answering questions. Gallivan also testified that he rarely had to repeat questions during the interview and that Piansiaksone did not have any trouble walking into the station.

While Piansiaksone's youth and his apparent fatigue are potentially more significant, we are unpersuaded that on balance they give rise to legally cognizable coercion. Piansiaksone was arrested and questioned two days before his seventeenth birthday, but he may have had more life experience than his age suggests. He stated that he had been a street gang member and had been living apart from his parents for several months prior to the questioning.

With regard to Piansiaksone's fatigue, the interrogation took place early in the morning, after he was awakened by the arresting officers.[3] Piansiaksone does appear to be tired in the videotape. On the other hand, he had slept for an extended period of time just before the arrest, did not sleep in the police car on the way to the station, and appeared to be coherent during the interview. Moreover, the fact that he inculpated himself early in the interview reduced the possibility that sleep deprivation caused the confession. In sum, our review of the record persuades us that Piansiaksone was not coerced into incriminating himself in violation of the Fifth Amendment.

## II. SCOPE OF VOIR DIRE

■ Piansiaksone asserts that the trial court erred in refusing to ask the jury seven

---

3. We note that Piansiaksone was arrested shortly after Gallivan was given information about his whereabouts. The timing of the interrogation thus resulted in part from the timing of the tip given to the police.

of his proposed voir dire questions.[4] Three of these questions were intended to disclose jurors' attitudes about persons from Southeast Asia, two were directed to feelings about differing degrees of homicide, and two sought information about how receptive jurors would be to Piansiaksone's theory of the case. The trial court declined to question jurors on the latter two topics but did ask a question about racial bias.[5] The trial court also asked the jurors whether they could apply the law as it was explained to them.

■ " '[V]oir dire examination has as its proper purposes both the detection of actual bias ... and the collection of data to permit informed exercise of the peremptory challenge.' " *State v. Worthen*, 765 P.2d 839, 844 (Utah 1988) (quoting *State v. Taylor*, 664 P.2d 439, 447 (Utah 1983)). The scope and conduct of voir dire examination is within the discretion of the trial judge. *State v. James*, 819 P.2d 781, 798 (Utah 1991); *State v. Bishop*, 753 P.2d 439, 448 (Utah 1988). Under the rule set forth in *James*, we have little difficulty concluding that the trial court's exclusion of these questions did not violate Piansiaksone's constitutional rights. *James* followed *Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S.Ct. 1899, 1908, 114 L.Ed.2d 493 (1991), which held that as long as the relevant subject area of potential bias was covered, the Fourteenth Amendment was not violated by the failure to ask questions in a particular manner. The trial court here asked questions that addressed both possible racial bias and the jurors' willingness to ap-

ply the law. The other two questions were not directed to a bias and therefore did not concern a topic that the trial court was required to cover.

However, concluding that Piansiaksone's constitutional rights were not violated does not entirely answer the question whether the trial court improperly limited voir dire:

While a limitation on voir dire which permits some questioning concerning subjects of bias may be sufficient for constitutional purposes under the standards of *Mu'Min*, the liberal exercise of voir dire for the purpose of detecting bias should not be abandoned by the trial court. Although failure to question jurors concerning issues in any certain way desired by counsel or to ask any specific question desired by counsel does not rise to the level of a constitutional violation so long as the relevant areas of bias have been covered, trial courts can and should conduct voir dire proceedings in a way which not only meets constitutional requirements, but also enables litigants and their counsel to intelligently exercise peremptory challenges and which attempts, as much as possible, to eliminate bias and prejudice from the trial proceedings.

*James*, 819 P.2d at 798. This court has long recognized the importance of permitting sufficient voir dire to "enabl[e] trial counsel to exercise peremptory challenges intelligently." *Worthen*, 765 P.2d at 844. "Indeed, the fairness of a trial may depend on the right of

4. The rejected questions were as follows:
 1. Do you have any close friends or relatives that are Vietnam Veterans? If so, what have they told you about their war experiences?
 2. Do you believe that the United States should impose limitations on people immigrating from other countries especially Southeast Asia?
 3. Do you feel that English should be the sole official language of the United States of America?
 4. There are different types of homicides which vary upon the state of mind of the defendant at the time the death resulted and the circumstances which surrounded the acts leading up to the death of another person. How do you feel about the concept that different degrees of homicide carry different penalties?

 5. Do you feel that all acts which result in the death of another person should be treated the same?
 6. Are you familiar with a circumstance in which a person accepted responsibility for the actions of someone else to shield the other person from blame?
 7. Why would a person take responsibility for someone else?

5. After indicating that Piansiaksone is Laotian and that many of the witnesses were "from Asian countries," the court indicated that it was improper to allow race to affect the trial and then asked: "My question to you is whether any of you would be prejudiced and could not give the defendant, because he is of the Laotian race, a fair and impartial trial. If any of you could not do this, please so indicate by raising your hands. The court sees no hands."

counsel to ask voir dire questions designed to discover attitudes and biases, both conscious and subconscious, even though they 'would not have supported a challenge for cause.'" *Worthen,* 765 P.2d at 845 (quoting *State v. Ball,* 685 P.2d 1055, 1060 (Utah 1984)). The detection of bias sufficient to support a for-cause challenge directly contributes to achieving a fair trial; however, voir dire also can provide counsel with clues to latent bias which may not support a for-cause challenge. In that way, by enabling counsel to intelligently decide which jurors harbor ill-defined attitudes unfavorable to the counsel's client, voir dire questions reaching beyond the scope necessary to discover for-cause bias also aid in producing a fair trial.

■ Furthermore, the importance of adequate voir dire has been heightened by our decision in *State v. Menzies,* 889 P.2d 393 (Utah 1994). That decision requires defendants to "show that a member of the jury was partial or incompetent" to obtain reversal based solely on a trial court's erroneous denial of a for-cause challenge. *Id.* at 398. In so doing, it gives defendants a greater incentive to ensure that peremptory challenges are used on those jurors most likely to harbor latent bias. Without adequate voir dire, it may be impossible for defendants to identify jurors harboring bias.

■ Obviously, then, questions which more directly search for questionable attitudes among jurors deserve more favorable treatment by trial courts than those which require multiple inferential steps or follow-up questions to elucidate real or possible bias. Although we have broadly stated that "[a]ll that is necessary for a voir dire question to be appropriate is that it allow 'defense counsel to exercise his peremptory challenges more intelligently,'" *Worthen,* 765 P.2d at 845 (quoting *Ball,* 685 P.2d at 1060), trial judges are not compelled to permit *every* question that is "appropriate" in the sense that it might disclose some basis for counsel to favor or disfavor seating a particular juror. We reemphasize that trial courts should be permissive in allowing voir dire questions and should exercise their discretion in favor of allowing counsel to elicit information from prospective jurors. *Worthen,* 765 P.2d at 845

(court has discretion, but "that discretion should be liberally exercised in favor of allowing counsel to elicit information"). "[W]hether the trial court abused its discretion [in determining the scope of voir dire] turns on whether, considering the totality of the questioning, counsel was afforded an adequate opportunity to gain the information necessary to evaluate jurors." *Bishop,* 753 P.2d at 448. The trial court must possess discretion in this context because of the multitude of factual variations that may affect the proper scope of questioning. That discretion is strictly limited where the questions are directly related to bias and prejudice, but increases as the directness of that relation decreases or, in some instances, where the question unduly intrudes upon the privacy of the jurors.

■ With regard to the questions not given in this case, we cannot say that the trial court abused its discretion. The court received no affirmative responses when it asked jurors if race would be a problem for them in acting as impartial jurors. While the three questions which Piansiaksone requested may have eventually led to indications of racial bias, each would have required several additional questions or inferences before reaching even an indication of latent bias. Had the proposed questions been more directly related to racial bias, we might be inclined to criticize the trial court for excluding them. In contrast, the two questions targeting jurors' attitudes about degrees of homicide were appropriate questions that might provide information about whether particular jurors, although affirming that they would apply the law as instructed, may be reluctant to do so and thus more likely to act in nullification. Although it is a closer question, we cannot say that under the facts of this case it constituted an abuse of discretion. Finally, the last two questions are more clearly directed at discovering jurors who would be favorable to Piansiaksone's theory of the case; therefore, while they are within the appropriate scope of voir dire, the trial judge has the greatest degree of freedom to exclude them. We conclude that the trial court did not abuse its discretion in declining to ask these questions.

## III. JURY INSTRUCTIONS

Piansiaksone asserts three errors in the jury instructions. He argues that (1) the instructions erroneously mandated an order of deliberation among the greater and lesser included offenses, (2) the instructions in effect prevented the jury from returning a verdict on the lesser included offense of manslaughter, and (3) the instruction on the manslaughter element of extreme emotional disturbance incorrectly stated the law. Piansiaksone raised each of these objections at trial and has renewed arguments on appeal. We will consider them in the order stated above.

■ As an initial matter, we observe that extreme emotional disturbance manslaughter is not a lesser included offense of the crime of murder because all the elements of extreme emotional disturbance manslaughter are not necessarily included within the elements of murder. *See State v. Baker*, 671 P.2d 152, 155 (Utah 1983). The elements of murder, as charged in this case, are that the defendant, "intending to cause serious bodily injury to another[,] commits an act clearly dangerous to human life that causes the death of another," or (2) "acting under circumstances evidencing a depraved indifference to human life engages in conduct which creates a grave risk of death to another and thereby causes the death of another." Utah Code Ann. § 76–5–203(1)(b)-(c). The elements of extreme emotional disturbance manslaughter are that the defendant causes the death of the victim "under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse." This form of manslaughter requires a particular mental element that is not necessarily encompassed within the elements of murder.

■ In *Baker*, 671 P.2d at 154–59, we explained that in addition to the above statutory "necessarily included element" definition of lesser included offenses, our cases have also recognized an "evidence-based standard" under which a lesser included offense may be deemed a lesser included offense if the "two offenses are related because some of their statutory elements overlap, and ... the evidence at the trial of the greater offense involves proof of some or all of those over-

lapping elements." *Id.* at 159. For an instruction under this definition to be given, the evidence must provide a " 'rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense.' " *Id.* (quoting Utah Code Ann. § 76–1–402(4)). Because of due process notice problems, the statutory "necessarily included" instruction may be given only if the prosecution requests a lesser included offense instruction. Any "evidence-based" lesser included offense instruction may, however, be given at the request of the defendant. *Id.* at 156–57. Because the elements of extreme emotional disturbance manslaughter overlap but are not completely contained within the elements of murder, this case presents an instance of an "evidence-based" type of lesser included offense.

■ Whether the trial court erred by mandating an order of deliberation in relation to the charged offense and the lesser included offense is a question of law, which we review for correctness. *State v. Powell*, 872 P.2d 1027, 1031 (Utah 1994), held that a "trial court is not to mandate a specific order of deliberation to the jury concerning lesser included offenses; rather, such instruction should be given by way of suggestion and recommendation." This rule safeguards the province of the jury from invasion by the court and seeks to avoid the situation where "a juror would have felt compelled to acquit as to the [greater] charge before considering the lesser included offenses." *Id.* at 1032. We upheld the instructions given in *Powell*, noting that in instructing the jury on the order of deliberation, they employed the term "should" rather than "must" and "did not specifically direct the jury to acquit on the charged crime before proceeding to the lesser included crimes." *Id.* While it is true, as the State points out, that the instruction in this case likewise used "should" rather than "must," this fact alone does not prevent the instructions from impermissibly mandating an order of deliberation. Instruction 23 stated:

The law permits the jury to find an accused guilty of any lesser offense which is necessarily included in the crime

charged in the Information whenever such a course is consistent with the facts found by the jury from the evidence in the case and with the law as stated by the court.

*The jury should first consider the greater, or charged offense in light of all the evidence.*

If the jury should then find the defendant "guilty" of the greater offense as charged, the jury should return that verdict *and not consider any lesser offense.*

If the jury should find the accused "not guilty" of the greater offense as charged in the information and defined in these instructions, then the jury should proceed to determine the guilt or innocence of the accused as to any lesser offense which is necessarily included in the crime charged, and on which the jury has been instructed.

(Emphasis added.)

 Under this instruction, the jurors· would have understood that they were to convict, if possible, on the charged offense before they even considered the crime of manslaughter. The instruction tells the jury to begin by considering the charged offense, and it explicitly tells the jury not to consider lesser offenses if the jury convicts on the charged offense. This conclusion is supported by the manslaughter elements instruction, number 25. That instruction states, "Before you can convict the defendant, Vongpachan Piansiaksone, of the offense of Manslaughter, a lesser included offense in the information, *you must have found that the evidence fails to establish one or more of the elements of Murder,* as charged in the information, beyond a reasonable doubt...." (emphasis added). Under these instructions, the jury was not permitted to convict of manslaughter unless some element of murder had not been satisfied, and the jury was directed not to *consider* any lesser offense if it convicted of murder.

As explained below, Piansiaksone's theory of the case essentially conceded the necessary elements of murder but alleged an addi-

tional factor that, if found by the jury, justified a conviction of manslaughter. For that reason, the jury instructions not only impermissibly mandated the order of jury deliberation of the greater and lesser offenses, but more importantly denied him his right to have the jury consider his theory of the case.

 Piansiaksone's theory of the case was that although he had intentionally shot and killed the victim, he had done so under the influence of an extreme emotional disturbance and therefore was guilty of manslaughter rather than of murder. The extreme emotional disturbance form of manslaughter is consistent with an intentional killing. *See State v. Norman,* 580 P.2d 237, 240 (Utah 1978). (It is also consistent with the alternative mens reas alleged by the State in this case.[6]) Instruction 25 specifically told the jury that it could not return a verdict of manslaughter unless it found that one or more of the elements of murder had not been satisfied. However, it was theoretically possible that the jury could have found that every necessary element for murder had been satisfied and yet that manslaughter was the crime committed if the jury found that the killing was committed "under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse." Therefore, instruction 25 was in error in stating that some element of murder must have failed before a conviction of emotional disturbance manslaughter was allowed. The instructions precluded the jury, as a matter of law, from actually returning a verdict of manslaughter.

Having concluded that the instructions improperly mandated an order of deliberation and deprived defendant of the right to have the jury consider his "defense" of manslaughter, it remains for us to decide whether these errors merit reversal. "An erroneous decision by a trial court cannot result in reversible error unless the error is harmful." *State v. Robertson,* 932 P.2d 1219, 1227 (Utah 1997). "Harmless error is an error that is

---

**6.** Those mens reas are that the actor either (1) "intending to cause serious bodily injury to another commits an act clearly dangerous to human life that causes the death of another," or (2) "acting under circumstances evidencing a de-

praved indifference to human life engages in conduct which creates a grave risk of death to another and thereby causes the death of another." Utah Code Ann. § 76–5–203(1)(b)-(c).

sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings. Put differently, an error is harmful only if the likelihood of a different outcome is sufficiently high that it undermines our confidence in the verdict." *Id.*

A criminal defendant is entitled to a lesser included offense instruction where there is some evidence to support the lesser offense; in addition, "[a] defendant is entitled to have his legal theory of the case placed before the jury if it would not be superfluous to do so because of an absence of any evidence to support the theory." *State v. Standiford,* 769 P.2d 254, 266 (Utah 1988); *see also State v. Harding,* 635 P.2d 33, 34 (Utah 1981). In *Harding,* we adopted the rule stated in *State v. Castillo,* 23 Utah 2d 70, 72–73, 457 P.2d 618, 620 (1969), and held that the court must give an instruction reflecting the defendant's theory of the case unless the evidence in support thereof was so slight that all reasonable people would have to conclude against the defendant on that point. 635 P.2d at 34; *see also Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); *State v. Tuttle,* 780 P.2d 1203, 1213 (Utah 1989).

The errors in instructions 23 and 25 were harmless because, beyond any reasonable doubt, there was no basis in the evidence to support the view that Piansiaksone killed the victim as the result of an extreme emotional disturbance.

Piansiaksone relies on the testimony of "Lucky" Bannavong, who was riding in the truck with Nuk and Piansiaksone shortly before the shooting. Bannavong testified at the preliminary hearing that Nuk and Piansiaksone were "angry" before they located Clay. However, Bannavong contradicted that testimony at trial, stating that Piansiaksone was "laughing" at the time. The only other evidence in the record about any reaction by Piansiaksone is his statement to Detective Gallivan that his shooting of the victim was "spontaneous," or "a reflex action."

The indirect evidence in the record which bears on whether defendant acted under extreme emotional disturbance, viewed in the light most favorable to that conclusion, simply does not, as a matter of law, provide a "reasonable basis or excuse" for extreme emotional disturbance. According to the evidence, Piansiaksone had been back in Utah for only a few days prior to the shooting. On the day of the shooting, he was told by Nuk, someone whom he respected as an older brother, that Nuk was angry with the victim for beating Nuk's sister and "disrespecting" his family, and Piansiaksone observed that Nuk was angry, which he had not previously seen. Nuk then asked or instructed Piansiaksone to shoot the victim. Any evidence that Nuk worked Piansiaksone into a frenzy is conspicuously absent: there is no suggestion that Nuk repeatedly demanded or importuned Piansiaksone to commit the shooting, no suggestion that Nuk called on his sense of honor or obligation to Nuk, no hint that he was upset by seeing Nuk visibly angry, no evidence that he felt the victim's acts in beating his friend's wife personally affected him, and no suggestion that he had any personal relationship with the sister.

The record also lacks any evidence that any of these facts would have had an unusual impact on Piansiaksone. For example, although Nuk told Piansiaksone that the victim was "disrespecting" Nuk's family, there is no evidence that Piansiaksone himself would find this a particularly provocative act on the victim's part. While the record contains hints that Piansiaksone held a strong animus toward Cambodians and often talked about killing them, even if we accepted the dubious proposition that this could provide a reasonable basis or excuse for extreme emotional disturbance, the record offers no basis for concluding that this dislike suddenly overwhelmed Piansiaksone's self-control and caused him to kill the victim, who was Cambodian. The same is true for the motive Piansiaksone offered to Detective Gallivan: that the victim was the member of a rival gang.

Finally, any evidence that might support a finding that *Nuk* acted under extreme emotional disturbance is relevant to Piansiaksone's emotional state only to the extent that Nuk's actions or expressions may have created an extreme emotional disturbance in Pi-

ansiaksone. The suggestion by defense counsel in closing argument that an emotional disturbance experienced by Nuk could somehow be transferred and satisfy the emotional disturbance element of manslaughter for Piansiaksone is obviously invalid under the facts of this case.

On the facts of this case, even if defendant's being told once or twice that someone had beaten the sister of a close friend—without any suggestion that the beating caused serious harm or was especially brutal—and had "disrespected" that friend's family, that is not, as a matter of law, a sufficient basis for a jury to find extreme emotional disturbance. All reasonable persons would have to conclude that the evidence of extreme emotional disturbance was either nonexistent or, at most, " 'so slight as to be incapable of raising a reasonable doubt in the jury's mind as to whether ... defendant' " killed the victim while under the influence of an extreme emotional disturbance. *Harding*, 635 P.2d at 34 (quoting *Castillo*, 23 Utah 2d at 72–73, 457 P.2d at 620). Accordingly, the errors in the instructions were harmless.

We also find Piansiaksone's final argument to be without merit. He asserts that the trial court erred by instructing the jury that manslaughter cannot involve a knowing or intentional mental state. This argument mischaracterizes the court's instruction. Instruction 28 stated in relevant part:

> For Manslaughter to apply, the "extreme emotional disturbance" must be triggered by something external to the accused, and his reaction to such external stimulus must be reasonable.... Such disturbance, therefore, cannot have been brought about by the defendant's own peculiar mental processes or by his own knowing or intentional involvement in a crime.

As the State points out, Piansiaksone's argument confuses knowledge and intent in causing the death of the victim with knowing or intentional involvement in a crime which in turn brings about an extreme emotional disturbance. The instruction merely explains that the manslaughter statute excludes defendant's *intentional involvement in a crime* from the class of circumstances that can give rise to an extreme emotional disturbance which mitigates murder to manslaughter. It says nothing about whether a defendant can intentionally kill another and still be guilty of manslaughter only.

## CONCLUSION

We affirm the conviction. The evidence of Piansiaksone's confession was properly admitted because the evidence does not show that it was coerced in violation of the Fifth Amendment. The trial court's refusal to ask the contested voir dire questions was within its discretion. The jury instructions erroneously mandated an order of deliberation and prevented the jury from considering the lesser included offense of manslaughter, but that error was harmless because the evidence did not support conviction of the lesser offense. Finally, the jury instruction on the extreme emotional disturbance mental state required for manslaughter did not misstate the law.

Affirmed.

HOWE, Associate C.J., and DURHAM, J., concur in Justice STEWART's opinion.

RUSSON, J., concurs in parts I and III and concurs in the result of part II.

ZIMMERMAN, Chief Justice, concurring:

I concur in the result reached by the majority. I also concur entirely in parts I and III of the opinion of Justice Stewart. However, I concur in part II of his opinion only to the extent of agreeing that the trial judge did not abuse his discretion in declining to ask the requested questions. I cannot agree with Justice Stewart's opinion to the extent that it suggests that it is a close question as to whether there was an abuse of discretion. I think the judge was well within the permissible latitude in refusing to permit the questions.