2009 UT App 81

**STATE of Utah, Plaintiff and Appellee,**

v.

**Brenda Christine WHITE, Defendant and Appellant.**

**No. 20071008–CA.**

Court of Appeals of Utah.

March 26, 2009.

---

Jason A. Schatz, Salt Lake City, for Appellant.

Mark L. Shurtleff, atty. gen., and J. Frederic Voros Jr., asst. atty. gen., Salt Lake City, for Appellee.

Before Judges BENCH, ORME, and DAVIS.

## OPINION

BENCH, Judge:

¶ 1 In this interlocutory appeal, Defendant Brenda Christine White challenges the denial of her motion in limine to include a jury instruction regarding the affirmative defense of extreme emotional distress. Contrary to Defendant's argument, the trial court did not err in evaluating the proffered evidence through an objective viewpoint. Nor did the trial court err in its conclusion that a highly provocative, contemporaneous trigger is required for Defendant's reaction to qualify as extreme emotional distress. As the triggering factors proffered by Defendant do not reach this level, the trial court correctly determined that she was not entitled to a jury instruction on this affirmative defense. We affirm.

## BACKGROUND

¶ 2 Defendant and the victim, Jon White, were married for eleven years before Mr. White left the marital home and initiated divorce proceedings. According to Defendant, Mr. White had caused stress for her during the marriage due to his infidelity, his use of pornography, and his pressuring her to participate in a sexual "three-some." The couple's separation in November 2005 had caused additional stress to Defendant due to Mr. White's subsequent failure to provide financial support, his withdrawal from contact with their children, and his cancellation of Defendant's health insurance coverage at a time when she needed medication for anxiety, depression, and sleep. The mediation of the couple's property settlement had also, in Defendant's eyes, produced an unfair result and burdened her with financial obligations that she struggled to meet during the time between entering into the settlement agreement and the finalization of the divorce.

¶ 3 In an attempt to address her mounting financial difficulties, Defendant sought to refinance the home that she had received as part of the property settlement. When she learned that she could not obtain refinancing without Mr. White's assistance, she requested his help. According to Defendant, Mr. White agreed to help but subsequently vacillated between cooperating and refusing to cooperate in the refinancing process.

¶ 4 On April 26, 2006, shortly after noon, Defendant went to Mr. White's workplace to speak with him regarding the refinancing of the home. Mr. White approached Defendant, explained that she needed to leave because she had "harassed employees [t]here before," and accompanied her to the elevator and out of the building. Once outside, Defendant and Mr. White discussed the terms of the property settlement and the refinancing of the home. Mr. White refused to sign a quitclaim deed as requested by Defendant until Defendant took his name off the two mortgages encumbering the home. While they stood outside Mr. White's workplace, Defendant had Mr. White speak to the bank officer on her cell phone where he reiterated his position.

¶ 5 Mr. White concluded the phone call and walked Defendant back to her car where they continued to discuss the issue of the quitclaim deed and refinancing. The conversation escalated in intensity, and Defendant raised her voice and impugned Mr. White. Defendant began repeatedly playing a song on her car stereo called "Angry Johnny," in which the lyrics state, "Johnny, Johnny, angry Johnny. . . . I want to kill you; I want to blow you away." Each time the singer sang the words "I want to blow you away," Defendant lip-synced the words, formed her hands in the shape of a gun, and pointed them at Mr. White's head. She did this over thirty times. Defendant also stated, "Isn't this great how songs can just motivate people? Wouldn't this be great if it was a true song?" Defendant also mentioned that her father took her "out shooting guns a lot" and that "[e]very time he teaches [her] how to shoot a

gun, [she] thinks [she's] shooting [Mr. White]."

¶ 6 Defendant eventually stopped playing the song and told Mr. White that she needed money for daycare. Mr. White agreed to pay, but Defendant would not tell him where the children were attending daycare. Defendant withdrew her request for daycare money and told Mr. White she wanted to terminate his parental rights. The conversation ended and Mr. White returned to work. As they parted, Defendant stated, "You are a parasite on this earth and I'm going to wipe you off this earth."

¶ 7 Approximately four hours later, Defendant returned to Mr. White's workplace. As she waited in the parking area in her Ford Explorer, Defendant saw Mr. White exit the building and walk toward his car while talking on a cell phone. According to Defendant, Mr. White had repeatedly denied owning a cell phone and had used this purported lack of a cell phone as an excuse for his lack of communication with the children and the difficulties in arranging visitation schedules for them. Defendant would later proffer that seeing Mr. White talking on the cell phone caused all the accumulated stress from the marriage and separation to overwhelm her, which in turn caused a sudden burst of anger, agitation, loss, grief, and disappointment.

¶ 8 As she watched Mr. White talking on his cell phone, Defendant drove her vehicle toward him, accelerating quickly. When Mr. White heard tires squealing, he jumped between two parked cars and then over a three-foot cement wall at the end of the covered parking structure. Mr. White ran back through the visitor parking lot and toward the building. As he approached the east entrance of the building, Defendant sped through the visitor parking lot in Mr. White's direction and turned the vehicle toward the building. Mr. White ran through the first set of doors, and Defendant drove the vehicle through the building's glass doors. Defendant struck Mr. White with the vehicle,

throwing him back approximately ten feet. Mr. White arose from the ground and ran down a corridor to the west lobby on the opposite side of the building. Defendant followed Mr. White down the hallway and hit him with her vehicle a second time. After this second strike, Mr. White flew over the hood of the vehicle and landed on the ground, injuring his left leg. While Mr. White hobbled down a small hallway and hid in a service closet, Defendant drove her vehicle through the glass windows of the west lobby, reversed the vehicle back through the lobby, briefly pulled forward again, and finally stopped.

¶ 9 Defendant was charged with attempted murder, *see* Utah Code Ann. § 76–5–203(2) (Supp.2003), and criminal mischief, *see* Utah Code Ann. § 76–6–106 (Supp.2002). She subsequently filed a motion in limine seeking a "pre-trial order authorizing the defense of Extreme Emotional Distress to be presented as a question of fact to the jury." Defendant argued that, on the date of the incident, she had lost self-control due to stressors that had accumulated over time and that she was therefore entitled to present a jury instruction for the affirmative defense of extreme emotional distress. Defendant proffered evidence regarding the dissolution of her relationship with Mr. White and the financial difficulties arising after their separation. Additionally, she proffered facts regarding the unexpected death of her therapist three weeks before the incident.[1]

¶ 10 In response to Defendant's motion in limine, the prosecution proffered additional evidence. Shortly after the attack, while still seated in her vehicle, Defendant had called Mr. White's sister and told her that she thought she had just killed Mr. White. Her tone of voice was reportedly matter-of-fact and unemotional. Furthermore, when a deputy approached Defendant while she was still seated in the driver's seat of her vehicle, the deputy observed that Defendant was not crying, upset, or emotional. The same deputy observed one empty prescription medication

---

1. Defendant was no longer covered by Mr. White's health insurance, and her therapist was providing her with free samples of the medication she needed. When the therapist died, Defendant was no longer able to receive the free samples. According to Defendant, Mr. White was not supposed to have cancelled her insurance coverage until a later date.

bottle in Defendant's car and another in her purse.

¶ 11 The prosecution further proffered that in an interview with a detective at the Salt Lake County Sheriff's Office, Defendant told the detective that she been in a car accident and drove through a building because she took too much medication. Defendant told the detective that she was on Xanax and Lexapro and that she had taken nine Valium capsules before returning to Mr. White's workplace that afternoon. Defendant expressed confusion about how Mr. White could have been injured and explained that she was just trying to chase him to get some paperwork. She also told the detective that when Mr. White went inside the building, her foot just went on the pedal and she went through the building.

¶ 12 Finally, the prosecution proffered that Defendant contacted the police in December 2005 to report her suspicion that Mr. White had viewed and stored child pornography on their home computer. The police reviewed the materials supplied by Defendant and found no evidence of child pornography. The investigation concluded, and charges were never brought against Mr. White.

¶ 13 The trial court denied Defendant's motion in limine, ruling that "[t]he defense of extreme emotional distress is not applicable" to Defendant's case. Specifically, the trial court held that "[t]he extreme emotional distress defense is available only to defendants who have been subjected to stress that would cause the average reasonable person to have an extreme emotional reaction and experience a loss of self-control." The trial court concluded that the factors proffered by Defendant did not meet that criteria because the stressors were not sufficiently provocative or closely related in time to Defendant's purported loss of self-control. Rather, the trial court determined that the stressors cited by Defendant were common occurrences-marital difficulties, financial stress, divorce complications, and death of a health care provider-many of which occurred weeks to years before the April 26, 2006 incident. As a result, the trial court concluded that there is "no rational basis in the evidence for [Defendant]'s theory that she committed At-tempted Manslaughter rather than Attempted Homicide."

¶ 14 Additionally, the trial court concluded that "[t]he circumstances of the crime itself indicate that Defendant White had not lost self-control at the time of the incident, but appeared to be acting in accordance with a plan." In support of this conclusion, the trial court cited the fact that Defendant had returned to Mr. White's workplace approximately four hours after the couple's disagreement and the fact that Defendant negotiated a complicated driving pattern to pursue Mr. White. According to the trial court, these facts "indicate[ ] that Defendant White was aware of what she was doing and was in control of her faculties during the time in question."

¶ 15 Defendant subsequently petitioned for interlocutory appeal, which we granted.

## ISSUES AND STANDARD OF REVIEW

¶ 16 Defendant asserts that the trial court erred in its conclusion that there was no basis in the evidence to justify a jury instruction on the affirmative defense of extreme emotional distress. More specifically, Defendant argues that the trial court erred (1) by failing to evaluate the evidence presented from the subjective viewpoint of Defendant and (2) by concluding that the stressors identified by Defendant were "too remote in time" or were not of a sufficiently "provocative character" to qualify as a trigger for extreme emotional distress. Defendant also claims that the trial court improperly determined that she was acting according to a plan rather than under a loss of self-control because such factual matters should be resolved by the jury. "Whether a trial court committed error in refusing to give a requested jury instruction is a question of law, which we review for correctness." *State v. Kruger*, 2000 UT 60, ¶ 11, 6 P.3d 1116.

## ANALYSIS

¶ 17 Defendant claims that the trial court erred by refusing to approve her requested instruction on the affirmative defense of extreme emotional distress. Pursu-

ant to Utah statute, "[i]t is an affirmative defense to a charge of . . . attempted murder that the defendant . . . attempted to cause the death of another . . . under the influence of extreme emotional distress for which there is a reasonable explanation or excuse." Utah Code Ann. § 76–5–203(4)(a)(i) (2008). "When a criminal defendant requests a jury instruction regarding a particular affirmative defense, the court is obligated to give the instruction if evidence has been presented . . . that provides any reasonable basis upon which a jury could conclude that the affirmative defense applies to the defendant." *State v. Low*, 2008 UT 58, ¶ 25, 192 P.3d 867. However, a court need not give the requested jury instruction where "the evidence in support [of the defendant's theory is] so slight that all reasonable people would have to conclude against the defendant on that point." *State v. Piansiaksone*, 954 P.2d 861, 871 (Utah 1998). In other words, the requested jury instruction need not be given where the evidence is "so slight as to be incapable of raising a reasonable doubt in the jury's mind as to whether . . . defendant [acted] . . . while under the influence of an extreme emotional disturbance." *Id.* at 872 (first omission in original) (internal quotation marks omitted); *see also State v. Kell*, 2002 UT 106, ¶ 25 & n. 5, 61 P.3d 1019 (concluding that evidence was insufficient to provide a rational basis for a jury instruction on an affirmative defense because "[t]he great weight of the evidence . . . runs contrary to [the uncorroborated testimony of the] defendant[ ]" offered in support of the claim).

## I. Objective Standard for Viewing Evidence

¶ 18 Defendant first claims that the trial court erroneously concluded that she was not entitled to a jury instruction on extreme emotional distress because the trial court did not view her proffered evidence from her subjective viewpoint. Utah Code section 76–5–203(4) states that extreme emotional distress "for which there is a reasonable explanation or excuse" is an affirmative defense to the charge of attempted murder. Utah Code Ann. § 76–5–203(4)(a)(i). Fur-

ther, the statute mandates that "[t]he reasonableness of an explanation or excuse . . . be determined from the viewpoint of a reasonable person under the then existing circumstances." *Id.* § 76–5–203(4)(c). Relying on a New York case, *People v. Casassa*, 49 N.Y.2d 668, 427 N.Y.S.2d 769, 404 N.E.2d 1310 (1980), Defendant asserts that the statute's requirement to view the explanation or excuse in light of the then existing circumstances obligates the trial court to view "the subjective, internal situation in which the defendant found himself and the external circumstances as he perceived them at the time, however inaccurate that perception may have been." *See id.* at 1316. We disagree.

¶ 19 Defendant's reliance on *Casassa* is misplaced. The statute underlying the *Casassa* court's decision required the reasonableness of an excuse "to be determined from the viewpoint of a person in the defendant's situation under the circumstances *as the defendant believed them to be.*" *Id.* at 1315–16 (emphasis added) (internal quotation marks omitted). This language is not found in Utah's current statute regarding the affirmative defense of extreme emotional distress. In fact, comparable language was removed from Utah's statutory scheme. Prior to 1985, Utah's statute regarding manslaughter—the predecessor to the affirmative defense at issue here–stated that "[t]he reasonableness of an explanation or excuse of the actor . . . shall be determined from the viewpoint of a person in the actor's situation under the circumstances *as he believes them to be.*" Utah Code Ann. § 76–5–205(2) (1973) (emphasis added). With the 1985 amendments to this statute, the legislature excised the phrase "as he believes them to be" and revised the statute to read, "The reasonableness of an explanation or excuse . . . shall be determined from the viewpoint of a reasonable person under the then existing circumstances." *Id.* § 76–5–205(3) (Supp.1985). Although the legislature subsequently recast extreme emotional distress manslaughter as an affirmative defense to murder rather than a lesser included offense,[2] it retained the

---

**2.** *State v. Low*, 2008 UT 58, 192 P.3d 867, con- tains an overview of the transition of manslaugh-

language regarding the viewpoint through which the reasonableness of the excuse is determined. *Compare id.* § 76–5–203(3)(a)–(d) (1999), *with id.* § 76–5–203(4)(c) (2008).

■ ¶ 20 Although a trial court is statutorily required to consider the circumstances surrounding a defendant's extreme emotional distress, those circumstances must be viewed from the viewpoint of a reasonable person. Thus, the legal standard is whether the circumstances that a particular defendant faced were "such that the average reasonable person would react by experiencing a loss of self-control." *State v. Spillers,* 2007 UT 13, ¶ 14, 152 P.3d 315 (internal quotation marks omitted). The trial court correctly identified this legal standard and did not err in evaluating whether the stressors proffered by Defendant would cause a reasonable person to experience a loss of self-control.

## II. Contemporaneous Provocation Required

■ ¶ 21 Defendant additionally argues that the trial court erred in refusing to adopt her requested jury instruction based on the conclusion that Defendant had not experienced a highly provocative, contemporaneous stress as a trigger for her emotional distress. Utah courts have defined extreme emotional distress as "intense feelings, such as passion, anger, distress, grief, or excessive agitation," that "overwhelm[ ]" a person's reason. *Id.* ¶ 14. The stress triggering these feelings must be " 'an external event' " or an "external initiating circumstance." *State v. Bishop,* 753 P.2d 439, 472 (Utah 1988), *overruled on other grounds by State v. Menzies,* 889 P.2d 393 (Utah 1994). The stress that triggers extreme emotional distress does not include "a condition resulting from mental illness" or "distress that is substantially caused by the defendant's own conduct." Utah Code Ann. § 76–5–203(4)(b)(i)–(ii). Rather, feelings of extreme emotional distress are a result of exposure to a stress that is "extremely unusual and overwhelming." *Spillers,* 2007 UT 13, ¶ 14, 152 P.3d 315 (internal quotation marks omitted).

¶ 22 Defendant points to *State v. Shumway,* 2002 UT 124, 63 P.3d 94, and *State v. Spillers,* 2007 UT 13, 152 P.3d 315, to support her contention that stressors that alone are not highly provocative may nonetheless trigger extreme emotional distress when those stressors accumulate over time. In *Shumway,* the Utah Supreme Court held that the defendant was entitled to a jury instruction regarding extreme emotional distress based on evidence that the victim "initiated a violent and traumatic act by attacking [the defendant] with the knife," that the victim "had a reputation for being a 'hothead' and losing his temper," and that the defendant "had been bullied and pushed around by his peers since he was in the third grade, [which all] 'came out on [the victim]' when the [victim and the defendant] fought over the knife." 2002 UT 124, ¶¶ 11, 10, 63 P.3d 94. In *Spillers,* the supreme court held that the defendant was entitled to a jury instruction on extreme emotional distress where the defendant shot the victim three times following an argument in which the victim "accused [the defendant] of snitching on him to drug enforcement agents regarding a drug deal." 2007 UT 13, ¶ 3, 152 P.3d 315. Among the evidence that the *Spillers* court concluded justified the instruction was the fact that the victim "retrieved a firearm," "struck [the defendant] on the back of the head," "cock[ed] his arm back to strike [the defendant] again," and "had a reputation for violence." *Id.* ¶ 16. Defendant emphasizes that two of the factors considered by the supreme court-the reputation of the victim in both cases and the bullying experienced by the minor defendant in *Shumway*-were either acquired over time or occurred years before the violent incident.

¶ 23 Contrary to Defendant's contention, however, these cases reinforce the requirement that a defendant's loss of self-control be in reaction to a highly provocative triggering event. In *Shumway,* the defendant's violent act was provoked when the victim "initiated" a fight by attacking the defendant with a knife. *See* 2002 UT 124, ¶ 11, 63 P.3d 94. Likewise, in *Spillers,* the defendant killed the victim immediately after an argument escalated and the victim brandished a gun,

ter from a lesser included offense to an affirma-

tive defense to murder. *See id.* ¶ 22.

threatened the defendant, struck the defendant, and attempted to strike him again. *See* 2007 UT 13, ¶¶ 3, 16, 152 P.3d 315. The victims' reputations for violence and the *Shumway* defendant's history of being bullied merely placed in context the contemporaneous and intense provocation experienced by the defendants.

¶ 24 A highly provocative trigger has been consistently required for a defendant in Utah to make a claim of extreme emotional distress. Where a defendant shot his ex-girlfriend because she " 'just ran off at the mouth,' frustrated him, and hurt his feelings," we concluded that there was no evidence supporting the defendant's contention that he was acting under the influence of extreme emotional distress. *State v. Price,* 909 P.2d 256, 263 (Utah Ct.App.1995). We stated, "Defendant is remiss in his assertion that frustration and hurt feelings reach the level of extreme emotional disturbance." *Id.* The Utah Supreme Court similarly rejected a claim of extreme emotional distress where the defendant shot the victim at the request of a close personal friend after the victim had beat the friend's sister and disrespected the friend's family. *See State v. Piansiaksone,* 954 P.2d 861, 871 (Utah 1998). The supreme court noted that the close personal friend had not "worked [the defendant] into a frenzy" and "there [was] no evidence that [the defendant] himself would find [the victim's disrespect of the friend's family] a particularly provocative act on the victim's part." *Id.*

■ ¶ 25 Furthermore, Utah law requires that the highly provocative event must be contemporaneous with the defendant's loss of self-control or such loss of self-control cannot be attributed to extreme emotional distress. In *State v. Clayton,* 658 P.2d 624 (Utah 1983), the supreme court upheld the trial court's refusal to instruct the jury on attempted manslaughter as a lesser included offense to attempted murder,[3] citing the passage of time between the provocative event and the defendant's violent action as determinative. *See id.* at 626. The defendant and

the victim in *Clayton* had fought at a bar, and friends broke up the fight after the victim had pushed the defendant backward into a window. *See id.* at 625. The defendant left the bar, returned fifteen or twenty minutes later with a gun, and then confronted and shot the unarmed victim. *See id.* The supreme court explained that even a twenty-minute "passage of time between the fight and defendant's return to the bar tends to negate the 'heat of passion' explanation" for the defendant's actions. *Id.* at 626.

■ ¶ 26 Notwithstanding this case law, Defendant argues that she is entitled to the requested jury instruction because the mistreatment she received from Mr. White in the years preceding their divorce is relevant to the affirmative defense of extreme emotional distress, just as ongoing domestic violence is relevant to a claim of self-defense. As Defendant indicates, Utah statutory law allows a jury to consider "any patterns of abuse or violence in the parties' relationship" to determine whether a person may claim self-defense in using force against another. *See* Utah Code Ann. § 76-2-402(5)(e) (2008). The legislature explicitly stated that its intent in enacting this statute was to allow "otherwise competent evidence regarding . . . [the] response [by a victim of domestic violence] to patterns of domestic abuse or violence [to] be considered by the trier of fact in determining [the] imminence" of another's use of unlawful force "or [the] reasonableness" of the domestic violence victim's belief that force is necessary to defend him or herself. *Id.* § 76-2-402 Legislative Intent.

¶ 27 This statute is inapplicable to Defendant's case. At no point in the proceedings did Defendant allege that she believed that Mr. White was about to use unlawful force against her or commit a forcible felony as he walked to his car, or that she was attempting to prevent death or bodily injury as she chased Mr. White with her vehicle. *See generally id.* § 76-2-402(1) (stating that a person may only claim that his or her use of

---

**3.** The lesser included offense to attempted murder at issue in *State v. Clayton,* 658 P.2d 624 (Utah 1983), is the functional equivalent to the affirmative defense to attempted murder in this case. *See generally State v. Low,* 2008 UT 58,

¶ 22, 192 P.3d 867 ("In 1999, extreme emotional distress and imperfect self-defense were removed from the manslaughter statute and inserted into the murder statute as affirmative defenses to murder.").

force was self-defense when "he or she reasonably believe[d] that force [was] necessary to prevent death or serious bodily injury to himself or a third party as a result of the other's imminent use of unlawful force, or to prevent commission of a forcible felony"). And we find it significant that the legislature has not enacted similar provisions in the statutory framework for the affirmative defense of extreme emotional distress.

¶ 28 Ultimately, the only contemporaneous, provocative event that preceded Defendant's loss of self-control was Mr. White's use of a cell phone that he had previously denied possessing. This event is not sufficiently provocative, even when viewed in its unique context, to entitle Defendant to a jury instruction on the affirmative defense of extreme emotional distress. Although Defendant had the opportunity to proffer as much evidence as she deemed necessary to show that she qualified for this affirmative defense, the only other factors actually proffered—marital difficulties, financial stress, parenting issues, other difficulties with divorce, and the death of a therapist—lack the requisite contemporaneous relationship to her loss of self-control. The trial court therefore correctly determined that the factors cited by Defendant do not rise to the level of an "extremely unusual and overwhelming" stress and that there is no reasonable basis in the proffered evidence upon which the jury could conclude that the defense of extreme emotional distress applies to Defendant's crime.[4]

## CONCLUSION

¶ 29 The trial court did not err in denying Defendant's motion to adopt a jury instruction on the affirmative defense of extreme emotional distress. The trial court properly applied an objective standard for viewing the evidence proffered by Defendant, and it correctly concluded that a highly provocative, contemporaneous trigger is required for a person's loss of self-control to qualify as extreme emotional distress.

¶ 30 Accordingly, we affirm.

¶ 31 WE CONCUR: GREGORY K. ORME and JAMES Z. DAVIS, Judges.

---

**4.** As we find these issues to be dispositive, we do not address Defendant's other claim of error.