2002 UT 124

**STATE of Utah, Plaintiff and Appellee,**

v.

**Brookes Colby SHUMWAY, Defendant and Appellant.**

No. 20001100.

Supreme Court of Utah.

Dec. 20, 2002.

Mark L. Shurtleff, Att'y Gen., Joanne C. Slotnik, J. Frederic Voros, Jr., Asst. Att'ys Gen., Narda Beas–Nordell, Salt Lake City, for plaintiff.

Linda M. Jones, Salt Lake City, for defendant.

HOWE, Justice:

## INTRODUCTION

¶1 Defendant Brookes Colby Shumway appeals from a judgment of conviction for murder, a first degree felony under section 76–5–203 of the Utah Code, and for tampering with evidence, a second degree felony under section 76–8–510.

## BACKGROUND

¶2 On January 22, 2000, then fifteen-year-old Brookes Colby Shumway spent much of the day with his friend, fourteen-year-old Christopher Ray. That evening, Brookes "slept over" at Christopher's trailer home. Brookes and Christopher were up until 5:30 a.m. playing video games. At about 7 a.m., Brookes went to Christopher's mother's room and awoke her by exclaiming that Christopher had tried to stab him and that he stabbed Christopher back and thought that he might be dead. Christopher's mother came out of her room and found Christopher lying on his back on the floor in the front room with a butcher knife covered in blood next to him. She called 911, and the police and paramedics arrived shortly thereafter. After trying to revive Christopher, the paramedics declared him dead at the

scene. The police searched the trailer and took into evidence the butcher knife, along with other knives from the kitchen. The police also found that blankets the boys had been using had blood stains and stab patterns in them and were rolled up in the corner of the front room. A gym bag in Christopher's bedroom contained bloody socks. Later that day, after the police finished their search and investigation, a crime scene cleanup company cleaned out the trailer. The next day, the state medical examiner reported that Christopher had been stabbed thirty-nine times and that some of the stab wounds, including the fatal neck wound to the carotid artery, apparently had been inflicted with an instrument other than the butcher knife found by police. That instrument was never found.

¶ 3 Brookes was subsequently charged with murder and with tampering with the evidence. The juvenile court certified him to stand trial as an adult in the district court. Following deliberations, the jury convicted Brookes of both charges. He now appeals.

## ANALYSIS

### I. FIRST DEGREE MURDER CONVICTION

¶ 4 Brookes contends that the trial court erred in giving jury instruction 26, which mandated the order of deliberation on the murder charge. That instruction stated:

> Before you can convict the defendant, Brookes Colby Shumway, of the offense of Manslaughter, a lesser included offense in count I of the information, you must have found that the evidence fails to establish one or more of the elements of Murder, as charged in count I of the information, beyond a reasonable doubt. . . .

¶ 5 Brookes' trial counsel made no objection to the jury instruction. Brookes now contends, and the State concedes, that the instruction was erroneous under *State v. Gardner*, 789 P.2d 273 (Utah 1989), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990). In that case, we held that the trial court is not to mandate a specific order of deliberation to the jury concerning lesser included offenses; rather,

such an instruction should be given by way of suggestion and recommendation. *Id.* at 284. Our decision in *Gardner* respecting the order of jury deliberation has been followed in *State v. Powell*, 872 P.2d 1027, 1031–32 (Utah 1994); *see also State v. Piansiaksone*, 954 P.2d 861, 869–70 (Utah 1998). Thus instruction 26 in the instant case was erroneous for mandating the order of jury deliberation.

¶ 6 Additionally, the instruction was erroneous because it can be interpreted to mean that the jury must find the defendant not guilty of murder before they may consider the offense of manslaughter. As we pointed out in *Gardner*, the jury may be instructed

> that they should consider the lesser included offenses if they do not find the defendant guilty of the charged offense. While the difference in wording is subtle, it avoids any misunderstanding that the jury must, by unanimous vote, acquit the defendant on the charged offense before it may consider the lesser included offenses.

789 P.2d at 284. Additionally, in the instant case the instruction was particularly erroneous because the jury should have been allowed to consider extreme emotional disturbance manslaughter even if they determined that all the elements of murder had been proved. In *Piansiaksone*, we wrote:

> [I]t was theoretically possible that the jury could have found that every necessary element for murder had been satisfied and yet that manslaughter was the crime committed if the jury found that the killing was committed under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse.

954 P.2d at 870. As previously mentioned, defendant's counsel at trial made no objection to jury instruction 26. However, defendant now contends that it was plain error on the part of the trial court and that under Utah Rule of Evidence 103(d), we should nevertheless hold that it was reversible error. Rule 103(d) states: "Nothing in this rule precludes taking notice of plain errors affecting substantial rights, although they

were not brought to the attention of the court."

¶ 7 Our case law requires that to establish plain error, a defendant must show that (1) the instruction was erroneous; (2) the error should have been obvious to the trial court; and (3) but for the error, there would be a reasonable likelihood for a more favorable outcome for the defendant. *State v. Saunders,* 1999 UT ¶¶ 57, 59, 992 P.2d 951; *State v. Dunn,* 850 P.2d 1201, 1208–09 (Utah 1993). The State concedes that the jury instruction was erroneous and does not dispute that the error should have been obvious to the trial court, but counters that any error caused thereby was harmless because there is no evidence which would support the conclusion beyond a reasonable doubt that defendant killed the victim as a result of an extreme emotional disturbance or in imperfect self-defense, either of which would justify a verdict of manslaughter.

¶ 8 The State's contention that the trial court's error was harmless requires us to examine the evidence that might support a verdict of manslaughter. Utah Code Ann. section 76–5–203(3) provides two circumstances where a charge of murder can be reduced to manslaughter:

> (3)(a) It is an affirmative defense to a charge of murder or attempted murder that the defendant caused the death of another or attempted to cause the death of another:
>
> (i) under the influence of extreme emotional distress for which there is a reasonable explanation or excuse; or
>
> (ii) under a reasonable belief that the circumstances provided a legal justification or excuse for his conduct, although the conduct was not legally justifiable or excusable under the existing circumstances.
>
> (b) under subsection (3)(a)(i), emotional stress does not include:
>
> (i) . . .
>
> (ii) distress that is substantially caused by the defendant's own conduct.
>
> (c) The reasonableness of an explanation or excuse under Subsection (3)(a)(i) or the reasonable belief of the actor

under Subsection (3)(a)(ii) shall be determined from the viewpoint of a reasonable person under the then existing circumstances.

### A. Extreme Emotional Distress Manslaughter

¶ 9 Turning first to consideration under subsection (3)(a)(i), we explained in *State v. Bishop,* 753 P.2d 439, 471 (Utah 1988), *overruled on other grounds by State v. Menzies,* 889 P.2d 393 (Utah 1994), that a person suffers from an extreme emotional disturbance "when he is *exposed* to extremely unusual and overwhelming stress" such that

> the average reasonable person under that stress would have an extreme emotional reaction to it, as a result of which he would experience a loss of self-control and that person's reason would be overborne by intense feelings such as passion, anger, distress, grief, excessive agitation, or other similar emotions.

*Id.* However, an extreme emotional disturbance will not serve to reduce murder to manslaughter if the actor brought about his own mental disturbance. *Gardner,* 789 P.2d at 282–83; § 76–5–203(3)(b)(ii).

¶ 10 One interpretation of the evidence supports the necessity for a manslaughter instruction under subsection (3)(a)(i). Brookes disclosed to police that on the morning of the altercation Christopher was irritated at him for beating Christopher at video games. As the boys went to bed, Christopher went to the kitchen and retrieved a knife that he began to throw in the air and catch. Christopher then lunged at Brookes and began poking him with the knife. The boys wrestled over control of the knife and in his anger, Brookes stabbed Christopher. Brookes also suffered stab wounds to his hand. There was evidence that Christopher had a reputation for being a "hothead" and losing his temper, while Brookes was known to be cooperative and peaceful. Other evidence supported the argument that Brookes had been bullied and pushed around by his peers since he was in the third grade, and that all of this "came out on Chris" when the boys fought over the knife.

¶ 11 Under this interpretation of the evidence, Brookes arguably did not bring about the disturbance by his own conduct, but rather Christopher initiated a violent and traumatic act by attacking Brookes with the knife. Christopher's aggressive conduct could be found by a jury to provide a reasonable excuse or explanation for Brookes' stress and rage that resulted in Brookes stabbing Christopher in the throat and chest. According to the medical examiner, "the lethal wound to the victim's throat was inflicted early in the struggle, while the victim's blood pressure was still good." There is evidence that the wounds other than the two potentially fatal stabs would not have been deadly. At the end of the encounter, Brookes went to Christopher's mother's bedroom to awake her and told her twice that Christopher had tried to stab him. Brookes assisted her in her efforts to resuscitate Christopher. He was peaceful and sobbing. Police officers who responded testified that Brookes was not violent or a danger, but was cooperative and nonthreatening.

¶ 12 The State responds that the plain intent of our statutory scheme is to mitigate the crime of murder where a defendant's conduct was clearly wrong but where the circumstances were so provocative that even a reasonable person might have reacted similarly. But, the State asserts, even assuming the truthfulness of defendant's version of the incident, those facts would not constitute a "reasonable explanation or excuse" for the stabbing of Christopher. The State asserts that no reasonable person under the then existing circumstances, teased by a good friend playing with a knife during a sleepover, would have become so enraged or experience such an extreme emotional disturbance as to cause him to kill that person by cutting his throat and stabbing him thirty-nine times.

¶ 13 We conclude that defendant was entitled to an instruction under subsection (3)(a)(i) because a jury could conclude that Brookes caused the death of Christopher "under the influence of extreme emotional distress for which there is a reasonable explanation or excuse." In holding that the defendant was entitled to an instruction under subsection (3)(a)(i), we do not suggest that Brookes' version of the events that took place is the only reasonable interpretation of the evidence. Most disturbing, of course, is the fact that the medical examiner testified that Christopher had been stabbed thirty-nine times. However, in *State v. Standiford*, 769 P.2d 254, 264, 266 (Utah 1988), we approved of the giving of instructions for manslaughter and self-defense based on the defendant's theory of the case where he had stabbed the victim 107 times. See also *State v. Cloud*, 722 P.2d 750, 753–55 (Utah 1986), in which we held that the defendant would be entitled to an instruction on extreme emotional distress manslaughter where the victim had been stabbed twenty-seven times and died of multiple critical wounds.

### B. Imperfect Legal Justification

■ ¶ 14 We next consider the evidence under subsection (3)(a)(ii) which reduces murder to manslaughter where defendant acted "under a reasonable belief that the circumstances provided a legal justification or excuse for his conduct, although the conduct was not legally justifiable or excusable under the existing circumstances." Again, under defendant's version of the events, Christopher was the aggressor. He approached Brookes in a threatening manner with a knife. The medical examiner testified that the fatal wounds were inflicted early in the struggle. Arguably, this could have occurred while Brookes perceived Christopher to be a threat. The injuries inflicted thereafter were not life threatening and in some instances were superficial. As earlier stated in this opinion, there is no evidence that Brookes was known to be a violent person or had aggressive tendencies. After the incident, Brookes went to Christopher's mother's room and told her what had happened. The State correctly argues that under a different interpretation of the evidence Christopher was lying down on his back when the fatal stab wounds were inflicted, and therefore Christopher's mother and sister, who were sleeping in other rooms in the trailer, were not awakened by any struggle. These conflicting interpretations of the evidence underline the importance of a correct jury instruc-

tion on Brookes' theory of imperfect legal justification manslaughter.

## II. EVIDENCE TAMPERING

¶ 15 Brookes next contends that the evidence is insufficient to support his conviction of evidence tampering. This crime is defined in section 76–8–510 of the Utah Code, which provides:

> A person commits a felony of the second degree if, believing an official proceeding or investigation is pending or about to be instituted, he:
>
> (1) alters, destroys, conceals, or removes anything with a purpose to impair its verity or availability in the proceeding or investigation. . . .

In our consideration of this assignment of error, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury. We will reverse a jury conviction for insufficient evidence only when the evidence is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted. *State v. Petree,* 659 P.2d 443, 444 (Utah 1983) (citing numerous cases). An observation made by this court in *Petree* bears repeating here:

> [N]otwithstanding the presumptions in favor of the jury's decision this Court still has the right to review the sufficiency of the evidence to support the verdict. The fabric of evidence against the defendant must cover the gap between the presumption of innocence and the proof of guilt. In fulfillment of its duty to review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict, the reviewing court will stretch the evidentiary fabric as far as it will go. But this does not mean that the court can take a speculative leap across a remaining gap in order to sustain a verdict.

*Id.* at 444–45 (citations omitted). The State based its charge of evidence tampering on Brookes' alleged concealment or destruction of the "second implement" which the medical examiner determined was used to inflict many or possibly all of the wounds on Christopher's body. Investigating officers' search of the trailer failed to produce the "second implement." Deputies Grogan and Bowman were the first officers to arrive on the scene. Bowman picked up the bloody butcher knife from the floor beside Christopher and placed it on the couch. Later, Detective Nelson conducted a search of the trailer. He had the scene and various items photographed and videotaped, identified items of evidence and placed yellow numbers by them, and collected items in an evidence bag. The items included various swabs from the trailer, the bloody gym socks, the knife that Deputy Bowman had placed on the couch, two blankets, a pillow, knives with barbeque sauce on them, and a fork. Nelson also collected at a later date the victim's clothing, Brookes' clothing, hair samples, and Brookes' journal. Nelson searched the outside garbage cans. Detective Park testified that three individuals spent several hours on January 23 processing the scene. He looked through trash cans and outside the trailer, and he talked to neighbors. He characterized the investigation as "thorough." It was not until the next day, January 24, that the medical examiner reported that at least eleven stab wounds were caused by a second implement which he described as approximately three inches in length with a narrow blade. He further opined that it was possible that the second implement was used to inflict all of the stab wounds.

¶ 16 The second implement was not found by anyone in the search and investigation conducted on January 23. Detective Nelson testified that when he learned on January 24 that a second implement that was not found by officers might have been used in the incident, he was "surprised." However, he did not make any attempt to go back to the trailer to search further. After officers had left the trailer on January 23, crime scene cleaners cleaned the trailer, and it was left unsecured.

¶ 17 In support of Brookes' conviction, the State points to Brookes' statement that the altercation took place at 5:30 a.m. and lasted for about thirty minutes, but that he did not awaken Christopher's mother until 7 a.m.

There was no testimony as to what happened during that hour, but the State asserts that Brookes had ample time to conceal or dispose of the second implement. Brookes, Christopher, his mother, and his sister were the only persons in the trailer at that time. It is undisputed that the latter two persons were sleeping. The State also relies on evidence that officers found blankets with slash marks and blood stains on the floor in the living room. The blankets appeared to have been bundled up and set aside. Police also found bloody socks in a gym bag in Christopher's bedroom. Because the bloody blankets and socks had been moved by Brookes, the State argues that it can be inferred that he disposed of the weapon he used. Finally, the State relies on an entry in Brookes' journal written several months after the stabbing which reads: "Do they know what kind of knife is the other." The State argues that that entry constitutes an admission by Brookes that a second implement did exist. The defense counters that the entry implies that Brookes was hopeful the officers were able to locate the unknown implement since it would clear him of evidence tampering.

■ ¶ 18 After giving full weight to all of the evidence supporting Brookes' conviction of evidence tampering, we conclude that the evidence is insufficient to sustain his conviction. At most, the evidence supports only the proposition that Brookes had the *opportunity* to destroy or conceal the second implement, if indeed it ever existed. As we wrote in *State v. Workman*, 852 P.2d 981, 985 (Utah 1993), "[a] guilty verdict is not legally valid if it is based solely on inferences that give rise to only remote or speculative possibilities of guilt." Other reasonable explanations exist why the instrument was not found. It could have fallen behind or underneath pieces of furniture in the living room where officers missed it in their search. It could have been found and discarded by the crime scene cleaners. Officers did not contact the crime scene cleaners after the clean-up to inquire whether they had found any such instrument. The journal entry is too terse and ambiguous to be reasonably relied upon. Only speculation supports the conviction. As we observed in *Petree*, 659 P.2d at 444–45, while we review the evidence and all infer-

ences in the light most favorable to the verdict, and stretch the evidentiary fabric as far as it will go, we cannot take a speculative leap across a remaining gap in order to sustain a verdict.

## CONCLUSION

¶ 19 Brookes' conviction of murder is reversed, and the case is remanded for a new trial. His conviction for tampering with evidence is reversed, and the charge is dismissed for insufficiency of the evidence.

¶ 20 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice RUSSON, and Justice WILKINS concur in Justice HOWE's opinion.