**2017 UT App 176**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ROBERT THOMAS RUST,
Appellant.

Opinion
No. 20150525-CA
Filed September 21, 2017

Third District Court, Salt Lake Department
The Honorable Paul B. Parker
No. 131901697

Samuel J. Hanseen and Alexandra S. McCallum,
Attorneys for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN and JILL M. POHLMAN concurred.[1]

ROTH, Judge:

¶1     Robert Thomas Rust appeals his convictions for one count of money laundering, a second degree felony, *see* Utah Code Ann. § 76-10-1903 (LexisNexis 2012); one count of conspiracy to distribute a controlled substance, a third degree felony, *see id.* § 58-37-8(1)(a)(ii), (1)(b)(ii); *id.* § 76-4-201; and two counts of filing a false tax return, a third degree felony, *id.* § 76-8-1101(1)(c)(i). We affirm.

---

1. Judge Stephen L. Roth participated in this case as a member of the Utah Court of Appeals. He retired from the court before this decision issued.

BACKGROUND

¶2    In early 2012, police began surveilling Rust's home after receiving a tip regarding his involvement in narcotics distribution. On two separate occasions, police observed "short stay vehicle traffic" at Rust's home. Police followed each vehicle until they could make a traffic stop and ultimately discovered methamphetamine in both vehicles.

¶3    While police were investigating Rust, they received a report from a casino in Wendover, Nevada, "as part of a routine reporting process of . . . suspicious gambling habits of persons who frequent gaming establishments." The report indicated that Rust "had recently lost a considerable amount of money" at the casino. Police went to the casino to gather documentation of Rust's gambling activities and discovered "an excessive amount of gambling occurring at the casino on the part of . . . Rust" that involved a loss of approximately $150,000.

¶4    Police obtained a warrant to search Rust's vehicle, his residence, a new residence into which Rust and his wife were moving, and the residence of Rust's stepson. In Rust's vehicle, police found a "glass pipe with some burnt white residue inside" and "[o]we sheets . . . documenting numerical transactions, money out, money owed." The investigating officer testified, based on his experience in narcotics investigations,

> Owe sheets are an item used by persons involved in the trafficking or distribution of narcotics to keep track of drugs that are sold and those drugs that have been paid for, the amounts they were sold for and the amounts that are still holding, who owes the amounts, [and] who the drugs . . . were received by.

In searching Rust's residences, police found more owe sheets, wire transfer receipts, W-2G tax forms for reporting gambling

proceeds, expensive stolen property, a large quantity of cash, a fake ID for Rust's wife, gambling receipts, a syringe, and a baggie with white residue. At the residence of Rust's stepson, officers found a bank account receipt registered to Rust's wife hidden inside a gaming device case behind an entertainment center. Officers also observed surveillance equipment at one of the residences, which the investigating officer testified is "a common tool used by persons engaged in the activity of narcotics distribution as a form of counter surveillance against law enforcement."

¶5     Rust was arrested and charged with money laundering, conspiracy to distribute a controlled substance, and two counts of filing a fraudulent tax return. A trial was held in April 2015.

¶6     At trial, in addition to the evidence outlined above, the State presented testimony from the girlfriend of one of Rust's alleged associates (Witness). Witness agreed to testify against Rust in exchange for a reduced sentence after she was arrested for a drug-related charge in 2012. Witness testified that her boyfriend sold drugs for a living and that she also participated. She further testified her boyfriend regularly purchased drugs from Rust. The boyfriend would communicate with Rust via text message about Witness's and her boyfriend's desire to buy drugs; then, Witness and the boyfriend would pick up the drugs from a third party that Rust identified and send the purchase money to Rust via wire transfer. She testified that the first time she met Rust was when she and her boyfriend went to Rust's house "to get drugs." They "got high," and then a third party arrived. Rust and Witness's boyfriend "split" the methamphetamine that she assumed they obtained from the third party, though she did not actually see an exchange take place. On another occasion, Witness's boyfriend asked Rust to meet him at a restaurant parking lot "so he could pick up a quarter pound." The boyfriend took $4,000 with him. Witness observed Rust pull into the parking lot in his vehicle, but she stayed in the car while her boyfriend got into Rust's vehicle. The

boyfriend stayed in Rust's vehicle for approximately ten minutes and then returned without the money but with drugs he did not have before he entered Rust's vehicle. On a third occasion, Witness and her boyfriend waited for Rust at a hotel. Her boyfriend received a text message from Rust indicating that he was waiting outside. Witness saw Rust outside the hotel, but she did not observe the exchange between her boyfriend and Rust. When her boyfriend came back from meeting with Rust, "he had another quarter pound" that he did not have before the meeting. Witness also testified that at the time she was arrested, she and her boyfriend were on their way to Rust's residence to pay Rust's wife $17,000 for drugs.

¶7     The State called an expert witness with expertise in money laundering who had examined Rust's financial records from the sixteen-month period between January 2011 and May 2012. The expert witness explained that gambling can be used to hide funds earned illegally: individuals "transfer money into an account at one of the casinos" and "will then gamble at that casino, put any winnings into that account and then transfer that money into other accounts that they have outside of the casino to make it look like the money that's in those new accounts came from winnings out of a casino." The State asked the expert witness whether specific hypothetical activities constituted money laundering. The expert testified that using cash from drug sales for a vehicle purchase, casino gambling, a wire transfer, a prepaid debit card, or a credit union account all constitute money laundering. The State presented evidence that Rust had done each of those activities.

¶8     The State also entered Rust's tax records into evidence. In the course of their investigation, police discovered that in 2011 and 2012, Rust earned legitimate income from Panda Express and the Rusts' janitorial business, Jani-King. The State called a tax expert to testify regarding Rust's tax returns. The tax expert testified that Rust's tax returns for 2011 reported income from a job at Panda Express, but failed to report any gambling losses or

winnings, illegal income earned from distributing narcotics, or self-employment income. His 2012 tax return reported self-employment income but neglected to report gambling losses or winnings, illegal income, or his Panda Express income.

¶9     At the close of the State's case-in-chief, Rust moved for a directed verdict. The trial court denied the motion. The jury convicted Rust on all charges. The court sentenced Rust to one to fifteen years in prison for money laundering and zero to five years in prison on each of the third degree felony convictions. The court ordered the sentences for the three third degree felonies to run concurrently with one another but consecutively with the money laundering sentence. Rust appeals.

ISSUES AND STANDARDS OF REVIEW

¶10     Rust asserts that the evidence was insufficient to support any of his convictions.[2] We will reverse a jury verdict for insufficient evidence only if "the evidence is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *State v. Shumway*, 2002 UT 124, ¶ 15, 63 P.3d 94.

¶11     Rust also asserts that the trial court committed plain error by permitting the money laundering expert to testify to legal conclusions about what activities constituted money laundering.

---

2. The parties dispute whether Rust's motion for a directed verdict was sufficient to preserve the specific challenges he raises on appeal. For purposes of this opinion, we assume that the challenges were preserved. *See, e.g.*, *State v. Peterson*, 2015 UT App 129, ¶ 2 n.1, 351 P.3d 812.

> To demonstrate plain error, a defendant must establish that (i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined.

*State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (alteration in original) (citation and internal quotation marks omitted).

ANALYSIS

I. The Evidence Was Sufficient to Support Rust's Convictions.

¶12    Rust challenges the sufficiency of the evidence to support each of his convictions.

A.    Conspiracy and Money Laundering

¶13    Rust first argues that the evidence was insufficient to prove the intent elements of his conspiracy to distribute methamphetamine and money laundering charges. The jury was instructed that it could convict Rust of the conspiracy to distribute a controlled substance charge if it found that he

> [a]greed with one or more persons to engage in or cause the performance of the crime of Distribution of the Controlled Substance methamphetamine which crime is defined by law as: (a) knowingly and intentionally; (b) distribute the controlled substance methamphetamine, or to agree, consent, offer, or arrange to distribute the controlled substance methamphetamine.

*See* Utah Code Ann. § 76-4-201 (LexisNexis 2012); *id.* § 58-37-8(1)(a)(ii). Similarly, the money laundering charge required the

jury to find that Rust knew the money represented "the proceeds of the distribution of a controlled substance." *See id.* § 76-10-1903.

¶14 At the heart of Rust's insufficiency claims is his assertion that Witness's testimony was "inherently improbable" and that without it, the State's evidence was insufficient to support his convictions. "Though the court must ordinarily accept the jury's determination of witness credibility, when the witness's testimony is inherently improbable, the court may choose to disregard it." *State v. Robbins*, 2009 UT 23, ¶ 16, 210 P.3d 288. Testimony is inherently improbable when it is "physically impossible" or so "incredibly dubious" that it is "apparently false." *Id.* ¶¶ 16, 18. For example, "a trial judge may reevaluate the jury's determination of testimony credibility in cases where a sole witness presents inherently contradictory testimony that is equivocal or the result of coercion, . . . there is a complete lack of circumstantial evidence of guilt," and "the court is convinced that the credibility of the witness is so weak that no reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* ¶ 18 (citations and internal quotation marks omitted).

¶15 We do not agree that Witness's testimony should have been disregarded as inherently improbable. Rust argues that the testimony was inherently improbable because Witness's cooperation agreement with the State gave her a motive to testify falsely, she never actually witnessed a physical exchange of drugs, and she "was high during the majority of her encounters with Rust." All of these factors, however, go to the weight of Witness's testimony rather than demonstrating that Witness's testimony was "physically impossible" or "apparently false." *See id.* ¶ 16; *see also State v. Pearson*, 943 P.2d 1347, 1352 (Utah 1997) ("A plea agreement requiring truthful testimony does not . . . render the testimony inherently unreliable."). Further, the circumstantial evidence corroborating Witness's testimony—e.g., the short-stay vehicle visits to Rust's home and their occupants' possession of methamphetamine; the owe sheets found in Rust's vehicle and residences; the wire transfer receipts for large,

irregular amounts of money from various individuals; and the discrepancy between Rust's legitimate income sources and the amount of cash going into and out of his accounts—would have made it inappropriate for the judge to take the credibility issue out of the jury's hands. *See Robbins*, 2009 UT 23, ¶ 19 ("The existence of any additional evidence supporting the verdict prevents the judge from reconsidering the witness's credibility.").

¶16 Although Witness did not observe a physical exchange of drugs and money between Rust and her boyfriend, she testified that her boyfriend made a living as a drug dealer, and that she saw her boyfriend and Rust splitting up some quantity of methamphetamine while all three were at Rust's house. She further testified that on two other occasions she witnessed her boyfriend arrange to meet Rust, saw them meet as arranged, and saw her boyfriend return in a short time with a substantial quantity of drugs he did not have before his encounters with Rust. The jury could reasonably have inferred from her testimony that exchanges of drugs took place, particularly given the additional circumstantial evidence presented at trial. In addition, the jury heard evidence that Witness was high on drugs on two of these occasions and had the opportunity to judge her reliability as an observer of the events she testified to and her credibility as a witness. *See State v. Workman*, 852 P.2d 981, 984 (Utah 1993) ("[T]he jury serves as the exclusive judge of both the credibility of witnesses and the weight to be given particular evidence.").

¶17 Based on the totality of the evidence the jury received, we are not convinced "that reasonable minds must have entertained a reasonable doubt" that Rust knowingly accepted money from Witness's boyfriend in exchange for large quantities of drugs so that her boyfriend could sell the drugs to others. *See State v. Shumway*, 2002 UT 124, ¶ 15, 63 P.3d 94. Accordingly, Rust's conviction for conspiracy to distribute methamphetamine is supported by sufficient evidence.

¶18    We also conclude that the evidence sufficiently supported the money laundering conviction. Rust contends that the evidence "failed to demonstrate that [he] knew the money and property constituted proceeds of unlawful activity." He also contends that even if "the source of the money was the sale of drugs," the evidence suggests that Rust's wife, not Rust himself, dealt the drugs, and that he "lacked knowledge that the money represented the proceeds of drug dealing." He further argues that the "evidence suggests that the money/property were the proceeds of lawful gambling," not drug distribution.

¶19    However, because there was sufficient evidence to support Rust's conspiracy to distribute drugs conviction, the same evidence reasonably supports a conclusion that Rust knew any proceeds he might have received therefrom represented proceeds of an "unlawful activity" rather than a lawful activity, such as gambling. If Rust intentionally and knowingly distributed drugs, he also had firsthand knowledge that the proceeds received therefrom were the result of drug distribution, an unlawful activity. *See* Utah Code Ann. § 76-10-1903(1) (LexisNexis 2012).

¶20    And, importantly, there was evidence from which the jury could reasonably have concluded that Rust received, transported, or acquired proceeds as a result of his conspiracy to distribute drugs. *See id.* For example, Witness testified that it was common practice for her boyfriend to wire transfer money to Rust in exchange for drugs, and police found wire transfer receipts in Rust's residences. Witness also testified that on one occasion she was present when her boyfriend met Rust in a parking lot and exchanged $4,000 for drugs. The State presented evidence that the police found numerous owe sheets "documenting numerical transactions, money out, money owed" in Rust's vehicle and his residences, which the investigating officer indicated are often "used by persons involved in the . . . distribution of narcotics to keep track of drugs that are sold and those drugs that have been paid for, the amounts they were sold

for and the amounts that are still holding." Further, the jury could reasonably have concluded from the evidence at trial that the large quantities of money at Rust's disposal for gambling and vehicle purchases—money that seemed to far exceed the income available to Rust through legitimate business and employment—resulted from his distribution of drugs rather than his gambling. *Cf. Workman*, 852 P.2d at 984 ("When the evidence presented is conflicting or disputed, the jury serves as the exclusive judge of both the credibility of witnesses and the weight to be given particular evidence.").

¶21 Accordingly, we conclude that the State presented sufficient evidence at trial to not only support Rust's conspiracy conviction but also the money laundering conviction.

B. Filing a False Tax Return

¶22 Rust also asserts that the evidence was insufficient to support the two charges of filing a false tax return because the State did not establish that his failure to report his earnings was done with the intent to evade paying taxes. *See* Utah Code Ann. § 76-8-1101(1)(c)(i) (LexisNexis 2012). According to Rust, "the evidence shows that any income earned constituted the proceeds of lawful employment and gambling." He asserts that he could have believed in good faith that he did not need to report his gambling winnings because they were offset by his losses and that he did not need to report "nominal income amounts" earned from Panda Express and Jani-King.

¶23 "It is well established that intent can be proven by circumstantial evidence" where "the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove that [the defendant] possessed the requisite intent." *State v. Holgate*, 2000 UT 74, ¶ 21, 10 P.3d 346 (citations and internal quotation marks omitted). Given the evidence that Rust had significant cash income from the sale of methamphetamine and that he was moving the

money around in an effort to conceal it, the jury could reasonably have inferred that Rust's failure to report his earnings was done with the intent to evade paying taxes.

## II. The Money Laundering Expert Witness's Ultimate-Issue Testimony Did Not Prejudice Rust.

¶24 Conceding that the issue was unpreserved, Rust next argues that it was plain error for the court to permit the money laundering expert to offer testimony on an ultimate issue in the case by opining that hypothetical conduct mirroring the State's allegations against Rust constituted money laundering. To demonstrate plain error, Rust must establish that permitting the ultimate-issue testimony constituted obvious, prejudicial error. *See id.* ¶ 13. Because we conclude Rust cannot establish that the alleged error was prejudicial, we reject this argument.

¶25 Although there is no absolute ban on expert testimony that embraces an ultimate issue, *see* Utah R. Evid. 704, expert "opinions that tell the jury what result to reach or give legal conclusions" are "impermissible," *State v. Davis*, 2007 UT App 13, ¶ 15, 155 P.3d 909 (citation and internal quotation marks omitted). In particular, expert testimony that "hypothetical [actions] consisting of the exact actions of which [the] defendant was accused" meet the requirements of a criminal statute has been held to be impermissible under rules 701 and 704 of the Utah Rules of Evidence. *See State v. Stringham*, 957 P.2d 602, 607–08 (Utah Ct. App. 1998) (explaining that such testimony could "easily" mislead a jury); *see also Davis*, 2007 UT App 13, ¶ 17 (holding that the testimony of an expert who "tie[d] [his] opinions to the requirements of Utah law . . . should have been excluded because it was an answer to a specific question [that] . . . appear[ed] on the verdict form" (alterations and second omission in original) (citations and internal quotation marks omitted)).

¶26    Even assuming, without deciding, that the money laundering expert testified to improper legal conclusions and that such a flaw should have been obvious to the trial court, Rust cannot demonstrate that he was harmed by the testimony. *See Holgate*, 2000 UT 74, ¶ 13. Rust argues that the expert's testimony prejudiced him because the expert implied "that money laundering could be committed without a culpable mental state." To convict Rust of money laundering, the jury was required to find that Rust knew the money represented "the proceeds of the distribution of a controlled substance." *See* Utah Code Ann. § 76-10-1903 (LexisNexis 2012). Because the evidence of Rust's participation in drug distribution was largely circumstantial, Rust asserts that there was a high likelihood that the money laundering expert's testimony improperly influenced the jury's verdict.

¶27    However, the fact that the jury convicted Rust on the drug distribution conspiracy charge relieves any doubt we may have had about improper influence on the outcome from the money laundering expert's testimony. As discussed above, the conspiracy charge required the jury to find that Rust

> [a]greed with one or more persons to engage in or cause the performance of the crime of Distribution of the Controlled Substance methamphetamine which crime is defined by law as: (a) knowingly and intentionally; (b) distribute the controlled substance methamphetamine, or to agree, consent, offer, or arrange to distribute the controlled substance methamphetamine.

*See id.* § 76-4-201; *id.* § 58-37-8(1)(a)(ii). Because the jury convicted Rust on the conspiracy to distribute charge, it clearly believed that he was knowingly or intentionally involved in the distribution of methamphetamine. If the jury believed that Rust knowingly or intentionally sold drugs, then there was little likelihood that the jury would have found that Rust did not

know the money he received from distributing drugs represented "the proceeds of the distribution of a controlled substance," even in the absence of the money laundering expert's testimony. And, as discussed above, *supra* ¶¶ 13–21, there was sufficient evidence—apart from the expert's testimony—to support both the conspiracy to distribute drugs and the money laundering convictions. As a result, any error in admitting that testimony was harmless.

## CONCLUSION

¶28    For these reasons, we conclude that the evidence was sufficient to support Rust's convictions and that any error in admitting the money laundering expert's ultimate-issue testimony was harmless. Accordingly, we affirm Rust's convictions.

—————