2019 UT App 139

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MARIO BRIAN QUINTANA,
Appellant.

Opinion
No. 20180107-CA
Filed August 15, 2019

Third District Court, West Jordan Department
The Honorable L. Douglas Hogan
No. 171400213

Teresa L. Welch and Owen N. Stewart, Attorneys
for Appellant

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

HAGEN, Judge:

¶1     Mario Brian Quintana appeals his convictions for one count of aggravated robbery and one count of robbery. Specifically, he argues that the State presented insufficient evidence to prove (1) his identity as the person who robbed a hotel at gunpoint (aggravated robbery count), or (2) his use of force or fear to take a woman's car keys to aid his escape (robbery count). Because a jury could reasonably find that the evidence supported his convictions for both aggravated robbery and robbery, we affirm.

BACKGROUND[1]

¶2    An individual brandishing a handgun-style BB gun entered the lobby of a hotel in Taylorsville, Utah, pointed the gun at the front desk receptionist, and yelled at her, "Give me your fucking money." The robber was wearing a black mask up to his nose, black and white gloves, white and red shoes, and a zippered hoodie with a Batman costume design and fabric ears on the hood. The receptionist immediately ran out of the building through an employee lunchroom behind the lobby.

¶3    The robber jumped over the front desk, entered a back room, and took the receptionist's handbag. Returning to the front desk with the handbag, the robber set the BB gun on the counter and emptied the contents of the cash register drawer onto the floor and into the handbag. He then exited through the front door of the lobby, leaving the gun behind.

¶4    From the side of the building, the receptionist observed the robber run out of the hotel in the direction of a nearby coffee shop. Moments later, the receptionist returned to the front desk called 911.

¶5    After receiving a dispatch call that someone in a black jacket and black pants had robbed the hotel, law enforcement officers arrived on scene and began to search the area for the robber. As one officer searched the area surrounding the hotel, he was directed to a blond woman walking nearby whom bystanders had observed running across the street with the

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Prater*, 2017 UT 13, ¶ 3 n.1, 392 P.3d 398 (quotation simplified).

robber. When asked about the robber's whereabouts, the woman directed law enforcement toward a nearby coffee shop.

¶6      When the uniformed officer arrived at the coffee shop, an employee directed him to an alleyway next to the coffee shop. According to the coffee shop employee, near the time of the robbery, customers in the drive-thru line were honking their horns and motioning toward someone running past them toward the alleyway.

¶7      In the alleyway, the officer found a man—later identified as Quintana—lying on the ground behind a barricade near a dumpster. The man jumped up as the officer approached. The officer ordered him to stop and get back on the ground, but Quintana refused and ran. The officer pursued him over a retaining wall, past a bank, and into a grocery store parking lot.

¶8      In the grocery store parking lot, multiple law enforcement officers observed Quintana run toward two women and a child. As Quintana approached the women and child, multiple uniformed and plainclothes officers continued to pursue Quintana with weapons drawn, ordering him to stop. One of the officers then observed Quintana shouting at the women, grabbing at something in one woman's hands or catching something the woman had tossed to him, and then apparently hiding behind the woman from whom he had taken the item. Concerned that the woman who tossed the item looked "very scared" and that Quintana was trying to take control of the woman's vehicle and escape, the officer attempted to block Quintana with his patrol vehicle. Quintana then ran into the grocery store where he was apprehended with the assistance of a taser.

¶9      Quintana was placed under arrest and provided a name to law enforcement that did not match his date of birth. At the time of his arrest, Quintana was wearing a dark hooded pullover, some jeans that "were kind of a little bit lighter in the

front but dark in the back," and shoes that were white and black with a distinct red tread. He was not wearing gloves.

¶10 After he was advised of his rights, Quintana admitted that he was a guest of the hotel before the robbery, that he went downstairs from his room and told the receptionist, "Give me your fucking money," and that the blond woman with whom the police had spoken outside of the hotel after the robbery was supposed to be his getaway driver. Quintana also confessed that when he saw a patrol vehicle, he ran toward the grocery store and demanded that a woman in the parking lot give him her keys, which she threw to him, and that he wanted to use her vehicle to outrun the police.

¶11 After the interview, a detective observed that Quintana left a glove behind in the interrogation room that appeared to match the gloves observed on the security footage of the robbery. An officer also discovered what was identified by the receptionist as her handbag hidden behind the dumpster in the alleyway where Quintana was hiding. The handbag contained a similar amount of cash as had been taken from the hotel.

¶12 The State charged Quintana with aggravated robbery, robbery, failure to stop at the command of a law enforcement officer, and providing false information to a peace officer. The case proceeded to trial at which the two women from the grocery store parking lot testified. They both identified Quintana as the man they observed running "straight toward" them in the parking lot as the police followed and shouted at him to stop. One of the women testified that when they saw Quintana running toward them, they started to walk away from their vehicle because "he was coming toward [them] and [they] were getting really scared that he would come right to [them], so [they] needed to get to safety." Quintana continued to run straight to them. He yelled at one of the women to give him her keys, which she then threw to him from five to ten feet away.

She testified that she felt like she had to give him her keys because she was scared for her life.

¶13    The other woman similarly testified that Quintana ran up to them and shouted. He yelled at her first to give him her keys, and when she told him she did not have any, he turned to her sister who tossed him the keys. She also testified that once he had the keys, Quintana stood right behind her sister. At that point, because she had seen Quintana running from the direction of a bank with police in pursuit with firearms drawn, she believed that Quintana had "a weapon on him" and was going to use her sister as a human shield or take her sister as a hostage.

¶14    None of the State's witnesses, apart from the receptionist, testified at trial to observing Quintana wearing a black Batman hoodie with black fabric ears on the hood during the course of his pursuit by law enforcement. The BB gun recovered at the scene was admitted at trial, but was not tested for DNA or fingerprints because the robber had worn gloves.

¶15    After the State rested, Quintana moved for a directed verdict on the aggravated robbery and robbery charges. The district court denied Quintana's motion, and he was convicted as charged. Quintana appeals his convictions for aggravated robbery and robbery.

ISSUE AND STANDARD OF REVIEW

¶16    Quintana appeals, challenging the sufficiency of the evidence to support his convictions for aggravated robbery of the hotel and robbery of the woman in the parking lot. "When reviewing a jury verdict on an insufficiency of the evidence argument, we view the evidence and all inferences drawn therefrom in a light most favorable to the verdict." *State v. Heaps*, 2000 UT 5, ¶ 19, 999 P.2d 565. And we will reverse the "verdict only when, after viewing the evidence and all inferences drawn therefrom in a light most favorable to the verdict, we find that

the evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust." *Id.* (quotation simplified). "So long as some evidence and reasonable inferences support the jury's findings, we will not disturb them." *Id.*

ANALYSIS

¶17    Quintana argues that the district court erred in denying his motion for a directed verdict on both robbery charges. First, Quintana argues that the State presented insufficient evidence to prove that he was adequately identified as the individual who robbed the hotel to support his aggravated robbery conviction. Second, Quintana argues that the State presented insufficient evidence to prove that he took the keys from the woman in the grocery store parking lot by means of force or fear to support his robbery conviction. We address each conviction in turn.

I. Aggravated Robbery of the Hotel

¶18    In contesting his conviction for aggravated robbery, Quintana challenges only whether there was sufficient evidence of identity. Quintana argues that the State failed to prove that he was the individual who robbed the hotel because he was not identified by the receptionist after the robbery and he was not wearing the hoodie with ears at the time of his arrest and claims he did not have time to change his clothing. But the State presented other evidence identifying Quintana as the robber sufficient to allow a jury to find him guilty beyond a reasonable doubt.

¶19    Most significantly, the State presented direct evidence identifying Quintana as the robber when it played the recording of Quintana's confession. In the recording, Quintana admits that he told the receptionist, "Give me your fucking money," and that he robbed the hotel front desk.

¶20 The State also presented considerable circumstantial evidence identifying Quintana as the robber. *See State v. Cowlishaw*, 2017 UT App 181, ¶ 13, 405 P.3d 885 (stating that "identification can be inferred from circumstantial evidence" and "direct, in-court identification is not required" (quotation simplified)). For example, the State presented testimony that after fleeing the hotel lobby, the robber ran toward the nearby coffee shop and moments later a coffee shop employee observed a disturbance in the coffee shop's drive-thru area, where people in their vehicles were honking their horns and motioning at someone running toward the alleyway. A law enforcement officer then discovered Quintana in the coffee shop alleyway, and Quintana fled when the officer ordered him to the ground. Another law enforcement officer later found the receptionist's handbag containing the stolen hotel cash hidden in the same alleyway. In addition, although the State did not present evidence that Quintana was wearing a hoodie with ears when he exited the hotel lobby, Quintana was wearing white sneakers with red markings at the time of his arrest. The receptionist described the robber as wearing shoes similar to those worn by Quintana, and the security footage from the hotel confirmed this description.

¶21 In light of this evidence, along with Quintana's own admission that he robbed the hotel front desk, we cannot say that "reasonable minds must have entertained a reasonable doubt" that Quintana was the individual who robbed the hotel front desk. *See State v. Shumway*, 2002 UT 124, ¶ 15, 63 P.3d 94. Therefore, the evidence supporting Quintana's aggravated robbery conviction was sufficient.

## II. Robbery in the Parking Lot

¶22 Quintana also argues that there was insufficient evidence to support his robbery conviction because the State's evidence did not prove that he used force or fear to obtain the keys from the woman in the grocery store parking lot. Specifically,

Quintana contends that the State failed to present evidence that Quintana's actions—running up to the woman as she and her sister and the child were walking to their car and demanding her car keys—would have caused an objectively reasonable person to hand over the keys out of fear that he would use immediate force against her. In making this argument, Quintana conflates two separate subsections of the robbery statute.

¶23    Under Utah law, a person commits the crime of robbery if he either

> (a) unlawfully and intentionally takes or attempts to take personal property in the possession of another from his person, or immediate presence, against his will, by means of force or fear, and with a purpose or intent to deprive the person permanently or temporarily of the personal property; or

> (b) the person intentionally or knowingly uses force or fear of immediate force against another in the course of committing a theft or wrongful appropriation.

Utah Code Ann. § 76-6-301(1)(a)–(b) (LexisNexis 2018). With the acknowledgement that he may have been convicted under either subsection (1)(a) or (1)(b), Quintana asks this court to read subsections (1)(a) and (1)(b) together and interpret "fear" as it is used in (1)(a) to mean "fear of immediate force" as set forth in (1)(b). In other words, he contends that the State was required to prove that he took the keys by use of "fear of immediate force."

¶24    Absent an ambiguity in the statute, which Quintana has not argued, "we presume that the legislature used each word advisedly, . . . thereby presuming all omissions to be purposeful." *See Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000 (quotation simplified). We therefore decline to read the

requirement "of immediate force" into the "fear" element of subsection (1)(a). Instead, under subsection (1)(a), the jury need find beyond a reasonable doubt only that Quintana accomplished the intentional taking by causing the victim to act out of fear, regardless of whether the victim's fear was the fear of immediate force.

¶25    The State presented substantial evidence that Quintana's actions intentionally and unlawfully caused the woman in the parking lot to surrender her car keys out of fear. At trial, the woman who tossed her keys to Quintana testified that she did so because she feared for her life. And the woman's subjective fear was objectively reasonable based on the surrounding circumstances, which Quintana used to his advantage to accomplish the robbery. *See People v. Morehead*, 119 Cal. Rptr. 3d 680, 689 (Ct. App. 2011) (assessing whether a victim's subjective fear was "objectively reasonable" in applying California's similarly worded robbery statute); *see also State v. Ireland*, 2005 UT App 209, ¶ 12, 113 P.3d 1028 (considering whether objective evidence supported the victim's reasonable belief that a robber threatened the use of a dangerous weapon in applying Utah's aggravated robbery statute). At the time he demanded her keys, Quintana was running from the direction of a local bank while pursued by multiple uniformed law enforcement officers with weapons drawn ordering him to stop. Quintana admitted that he knew the police were in pursuit and that he intended to take the woman's car to aid his escape. Quintana appeared to target the women and child by running straight toward them, even after they tried to avoid his path and get to safety. He shouted at the women, demanding their keys. It also appeared to the women and to the officers that Quintana was either attempting to hide behind one of the women or take her hostage. The objective circumstances would lead a reasonable person to conclude that Quintana was likely armed and dangerous and desperate to escape. In light of this evidence, a reasonable jury could find that Quintana accomplished the taking by means of fear.

CONCLUSION

¶26    The State presented sufficient evidence to prove that Quintana was the individual who robbed the hotel and that he intentionally and unlawfully took the woman's car keys against her will by means of fear. Accordingly, we affirm his convictions for aggravated robbery and robbery.

_____